UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA           :

      - v. -                          :        11 Cr. 424 (NRB)

EARL DAVID,                        :

              Defendant.   :

------------------------------------x


## GOVERNMENT'S SENTENCING MEMORANDUM


                                                PREET BHARARA
                                                United States Attorney for the
                                                Southern District of New York
                                                Attorney for the United States of America

Janis Echenberg
James J. Pastore, Jr.
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

    - v. -       :       11 Cr. 424 (NRB)

EARL DAVID,       :

        Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in connection with the sentencing of defendant Earl David ("David" or the "defendant"), which is currently scheduled for April 10, 2013 at 4 p.m. In its Presentence Investigation Report ("PSR"), the United States Probation Department ("Probation Department") correctly calculates the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 78 to 97 months' imprisonment. The Probation Department recommends a sentence of 78 months.

David seeks a below-Guidelines sentence, seeking leniency due to mental health problems and family circumstances which he says led him to commit a massive immigration fraud. David further claims that although he accepts responsibility for his actions, he is less culpable than the Government alleges; specifically, (i) he was not the mastermind of the fraud, (ii) he profited only "modestly," and (iii) his criminal activity was actually a misguided attempt to help clients with their immigration woes.

The evidence in this case, in particular the evidence presented at the recent trial of four of David's co-conspirators (Gulay Cibik, Refael Brodjik, Nathan Schwartz and Harold Tischler) belies these claims. Over and over, the documents and testimony elicited at trial confirmed that Earl David masterminded a vast immigration fraud scheme that persisted for over a decade, and involved thousands of fraudulent applications. David recruited dozens of other people – often family members or former clients – to work in his office and trained them to assist with the fraud; virtually no part of his immigration law practice was legitimate. With respect to David's claim that he desired only to help his clients, in truth, he deceived many of them, too, by taking their money and filing labor-certification applications in their names, only to later replace them with other aliens who were substituted on the labor certifications. Thus, the original clients were left out of status and out of the thousands of dollars they had paid to the David Law Firm. Many clients got, at most, one year of work authorization – not the permanent legal status they were promised. David also laundered proceeds of this fraud in an effort to distance himself from it after he was disbarred and under investigation.

Importantly, this case is not the defendant's first encounter with the law. In the 1990s, David participated in a securities fraud and bribery scheme; ultimately, he agreed to cooperate with the government, for which he received immunity. However, during the very time that he was cooperating with the government and promising to tell the truth in that case, he was committing the massive fraud in this case. As a result of his fraudulent conduct in the securities and bribery scheme, David was suspended from the practice of law. Undeterred by his suspension, David continued to operate the immigration fraud scheme charged in this case. He simply undertook various methods of deception following his suspension – including operating

out of a home office and recruiting another lawyer (Jed David Philwin, who has also pleaded guilty) to sign documents in his place – so that his own practice of law would remain undetected.

After David's firm was under investigation, David fled to Canada, where he is a citizen. Even following his flight, however, he continued to file fraudulent on-line applications and cause illicit profits from the scheme to be funneled to him in Canada, including through a bank account in the name of a biblical treatise he had authored entitled "Code of the Heart." Despite his claims to the contrary, David actively participated in and facilitated the fraud from Canada.

Even after his arrest in this case, David continued to lie as he fought detention prior to extradition. For example, he falsely testified that his move to Canada had nothing to do with the Government's investigation (and he persists in that incredible claim even today), and that he did not illegally practice law while in Canada. (October 21, 2011 Hearing Tr. at 10-15, attached as Exhibit B). David's brazen lies led the Canadian court to find his sworn testimony incredible. (*See* Detention Order, attached as Exhibit B, at 7-8).

Consistent with the Probation Department's recommendation, and for the reasons set forth below, given the nature and circumstances of David's massive fraud, his legal training and prior deceptions, and the great need in this case to promote deterrence, respect for the law and ensure just punishment, the Government believes that a sentence within the applicable Guidelines range of 78 to 97 months is entirely appropriate in this case.

## BACKGROUND

A. **David Conceived Of And Executed A Massive Immigration Fraud**

Beginning in at least 1996, David, an attorney, operated a Manhattan-based immigration law firm that took in millions of dollars through a sophisticated immigration fraud scheme. (PSR

¶ 31.) The firm (referred to herein as the "David Firm") was in David's name until he was disbarred, and then was in the name of several other attorneys who signed documents on David's and other co-conspirator's behalf. Despite his claims to the contrary, based on law firm files, bank records, DOL and CIS records and cooperator testimony, it is clear that millions of dollars flowed from the firm to accounts controlled by David between 1996 and 2009. United States Citizenship and Immigration Services ("CIS") counts this as one of the largest immigration fraud schemes to ever have been committed in the United States.

The scheme exploited several immigration laws, including an amnesty period that ended in 2001 and a law permitting aliens to petition for legal status after obtaining a certification from the United States Department of Labor ("DOL") signifying that a U.S. employer wished to employ, or "sponsor," them. An alien who obtains the DOL certification can then use it to petition CIS to obtain legal status in the United States. In return for fees ranging from approximately $2,500 to as much as $30,000 per alien-client, the David Firm applied for and obtained thousands of DOL certifications based upon non-existent employment sponsorships. In the course of the scheme, the David Firm fabricated documents, including DOL records indicating that aliens entered the country during the amnesty period, as well as false pay stubs, fake tax returns, and made-up "experience letters," all purporting to show that the sponsorships were real and that the aliens possessed special employment skill sets justifying labor-based certification by DOL. In reality, the sponsors had no intention of hiring the aliens, and the sponsor companies often did not even exist other than as shell companies for use in the fraudulent scheme. As a result of the fraud, DOL issued thousands of certifications, and

immigration authorities granted legal status to thousands of the David Firm's clients, when such adjustments were unwarranted and otherwise would not have been made. (PSR ¶ 32.)

In furtherance of this scheme, Earl David and his employees recruited many people to participate, including dozens of individuals who, in exchange for payment, agreed to falsely represent to DOL that they were sponsoring aliens for employment. Co-conspirators also included accountants who created phony tax returns for the fictitious sponsor companies, and a corrupt DOL employee who helped ensure that DOL certifications were granted based upon the fraudulent applications. (PSR ¶ 33.)

David was the architect of this fraud scheme. From at least 1996 until in or about 2006, David was the principal operator of the David Firm. David created phony companies, generated bogus documentation to support the fraudulent DOL applications and CIS immigration petitions, and instructed his employees how to do the same. Tr. 1183. The David Firm generated thousands of fraudulent CIS and DOL applications, many of which David personally signed and submitted. David and his co-conspirators defrauded government agencies on an epic scale.

David and his co-conspirators profited handsomely from the scheme. Even during the period when David was charging, as he describes it, "modest" fees, the firm's clients were often charged $2,500 to $4,000 (if they had their own sponsor) and approximately $6,000 to $7,000 if they needed a "sponsor." And when David left his firm in the hands of Sam Salamon and Leo Teitelbaum,[1] but continued to assist and advise them, and collect a share of profits from them, clients were charged exorbitant fees -- $6,500 if they did not need a sponsor and $15,000 to

---

[1] David's submission mistakenly states that Salamon and Teitelbaum were attorneys. Sent. Ltr. at 4. Having recruited Salamon and Teitelbaum, David is, of course, well aware that neither was an attorney. Indeed, trial testimony revealed that David once reprimanded Salamon for a posting on a website that made it appear as though Salamon was an attorney. Tr. 1175-76. Moreover, David specifically sought out and hired other attorneys to sign documents after he was disbarred.

$18,000, even as high as $30,000, per client, if they did. Tr. 1203-1204. According to testimony and email correspondence, David sought to collect 10% of the David Firm's ill-gotten gains. Tr. 1206, 1218; GX 3031-7, 3031-5, 3011.[2] Worse still, David and his employees frequently substituted paying clients out of cases, without the clients' knowledge (after valuable employment certifications had been issued) and would then sell those certifications to other clients for large sums of cash. At other times, necessary paperwork was never even filed at all. Tr. 912-913. Thus, David's argument that he was driven by a "deep and sincere desire to enable his clients to be reunited with their families and have a better life," is not credible. First of all, the majority of the firm's clients already were in the United States and therefore did not need any assistance being reunited with relatives here. Furthermore, as a direct result of David's scheme, while some aliens did obtain legal status, albeit based on fraud, many others paid high fees and then, either because the fraud was uncovered or because they were substituted out and left with no status, lost the opportunity to remain in this country at all.

David brazenly operated the scheme while simultaneously cooperating with the Government in a separate securities investigation.[3] Then, after he was suspended from the practice of law (in New York State in March 2004 and in New Jersey in October 2004) as a result of his role in the securities fraud, he continued to orchestrate the scheme from behind the scenes. Finally, after his firm came under investigation, David was still undeterred and fled to Canada where he remotely controlled the fraud. Despite his protestations otherwise, multiple witnesses and emails introduced at trial make clear that Earl David fled to Canada in or around late 2005 after learning that his firm was under federal criminal investigation. Tr. 1204, GXs

---

[2] The Government Exhibits from trial referenced herein are attached as Exhibit G.
[3] According Salamon, David even bragged about committing the immigration fraud while cooperating in another case.

3011, 3012. While the day-to-day operations were handled by others after he fled, David continued to facilitate the fraud in critical ways, including by filing on-line labor certification applications, advising employees at the David Firm, and mediating disputes among them. *See*, GXs 601-1, 3006, 3031-6, Tr. 1205-1207. David directed illicit profits be laundered and funneled to him in Canada, including through co-conspirator Refael Brodjik, and through a bank account in the name of a biblical treatise David had authored entitled "Code of the Heart." Tr. 1173, 1206. In or around 2006, Refael Brodjik transmitted approximately 10% of the firm's earnings to David in Canada. Tr. 1206, 1218; GX 3031-7, 3031-5, 3011. And a review of Leo Teitelbaum's American Express records show charges to Code of the Heart of nearly $98,000 paid to David in 2007 and 2008.

The David Firm ceased operations in early 2009, when federal search warrants were executed at several locations associated with the firm. (PSR ¶ 34.) Twenty-six people have been charged with immigration fraud offenses in connection with their work for and with the David Firm. All but two (who remain fugitives) have pleaded guilty or been convicted at trial. (PSR ¶¶ 10-29.) Every single one of them was recruited by and/or worked at David's direction, or at the direction of someone David himself had recruited. There is no one more culpable of conceiving of or executing this massive fraud than David.

**B.     The Indictment, Extradition, David's Guilty Plea, and the Guidelines Calculation**

On October 5, 2011, a grand jury in this District returned a superseding indictment charging David and eleven co-defendants in four counts: conspiracy to commit immigration fraud and make false statements, in violation 18, U.S.C. § 371 (Count One); making false statements in connection with immigration documents, in violation of 18 U.S.C. §§ 1546(a) and

2 (Count Two); conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count Three); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Four) (the "Superseding Indictment"). David was arrested in Toronto, Ontario, on the basis of a provisional arrest warrant from the United States. (PSR ¶ 36.)

David sought bail pending extradition, which the Government opposed. After David testified at a hearing, the Canadian Court ordered him detained, finding a significant risk of flight based on, among other reasons, serious concerns about David's credibility. In an Order dated October 25, 2011, Judge Forestell of the Superior Court of Justice in Ontario, Canada, found David's testimony not "credible with respect to timing or motivation for his move to Canada," which David claimed was to "comply with the terms of his [bar] suspension" and was unrelated to the fraud investigation in this case. Exhibit B at 7. Judge Forestell also found that David continued to practice law with the David Firm in New York despite having lost his New York law license. Specifically, David "conceded that he 'filled out forms on request' when lawyers[4] from the Earl David firm asked him to do so for immigration clients," including "forms downloaded from the internet." Exhibit B at 8.

David was extradited to the United States on January 24, 2012, and has been incarcerated since his arrival in the United States. (PSR ¶ 36.) On April 2, 2012, pursuant to a plea agreement, David pled guilty to Counts One and Three of the Superseding Indictment. (PSR ¶ 8.) The defendant further agreed to forfeit to the United States a sum of money equal to $2,500,000, representing the amount of proceeds the defendant obtained as a result of the offenses. (*Id.*)

---

[4] Based on testimony at trial, it was primarily Salamon, Teitelbaum and other non-lawyer employees of the Firm who made these requests. Tr. at 1205.

The Probation Department has correctly calculated the defendant's Offense Level and Criminal History Category under the Guidelines, resulting in an Adjusted Total Offense Level of 28 and a Criminal History Category of I. (PSR ¶¶ 48, 68.) This results in a Guidelines range of 78 to 97 months' imprisonment, which is consistent with parties' calculation in the plea agreement. (PSR ¶ 100). The Probation Department recommends a sentence of 78 months' imprisonment. (Sentencing Recommendation at 27).

## ARGUMENT

A substantial sentence is warranted in this case. David devised and orchestrated a massive and highly lucrative fraud, deceiving immigration authorities and his own clients, again and again, for over a decade. He brazenly continued to facilitate the fraud even while cooperating in another federal investigation; took steps to hide his involvement in the fraud after losing his law license; and, after learning that the Government had initiated a criminal investigation of his firm, fled to Canada where he remotely operated the fraud. In other words, at each stage where one might reasonably expect an individual to be deterred from committing further crimes, David instead showed himself remarkably impervious to deterrence.

The Government has identified at least 25,000 immigration applications filed with U.S. government agencies by David and his co-conspirators – the vast majority of which have been determined to contain false, fraudulent, and fictitious information. The fraud was David's brainchild, and he personally recruited and assisted those who kept the fraud going after he left the United States.

For all of these reasons, as well as for the importance of deterrence, promoting respect for the law, and providing just punishment in this case, the Government respectfully submits that a

sentence within the advisory Guidelines range of 78 to 97 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

## I. Applicable Law

Although they are no longer mandatory, the Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). As the Second Circuit has remarked *en banc*, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464.

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any

relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 128 S. Ct. at 596).

## II. The Nature and Circumstances of this Offense are Egregious

As set forth above, this is one of the largest immigration fraud schemes ever committed in the United States. While David claims to take full responsibility for his criminal activity, he significantly minimizes his central role in the fraud, asserting that he "lacks the capacity to mastermind a criminal conspiracy" and was only "tangentially involved in the fraud after his law license was suspended." (David March 8, 2013 Sentencing Letter ("Sent. Ltr.") at 1-4).

Although David was not physically present at the recent trial before Your Honor, he was ever-present during testimony given his instrumental role in conceiving of and continuing the fraud for over a decade. Both of the cooperating witnesses testified about being personally recruited by David and being trained by him on how to commit the fraud. Tr. at 695-97, 1179-81. Testimony at trial also revealed that David recruited dozens of others – including former clients (Urbanek, Brodjik) and family members (Flam, Herbst) – to participate in the fraud and taught them how to conduct various aspects of the fraud. *See, e.g.,* Tr. at 739, 756-57, 781, 1347. And both cooperators also noted that there were certain parts of the fraud – namely, on line applications – for which they relied on David even after he was disbarred and later fled to Canada. Tr. at 737-38, 1205. A former client also testified to meeting with co-defendant Gulay Cibik several times, in or around 2005 and 2006, while she communicated by phone with David, who was advising Cibik on how to prepare a fraudulent application. Tr. at 472. Emails and documents also showed David's continued involvement after his disbarment and flight. GXs 601-1, 3006, 3017, 3031-6.

### III. David's History and Characteristics, Including His Legal Training, Also Support a Substantial Sentence in This Case

David's history and characteristics also suggest that a substantial sentence is warranted in this case. There is no question that David has encountered tragic circumstances in his life. But despite that tragedy (rather than because of it), he managed to graduate from college and law school and to orchestrate a massive fraud. In the early 1990s, when he was involved with a much smaller fraud, and was caught, he was given a pass. But that did not deter him, or encourage him to seek help for whatever drove him to commit that fraud. In fact, he has never

-13-

sought mental health treatment. (PSR ¶ 79). Instead, he persisted, undeterred, and convinced many others to participate in the fraud with him.

Despite the self-serving description in his submission that he was easily taken advantage of (Sent. Ltr. at 17), testimony and emails admitted at trial painted a very different picture of a charismatic leader who convinced others to break the law. David used his legal skills and intellect to exploit an area of immigration benefits – labor-based benefits – where DOL and CIS relied heavily on certifications by lawyers and applicants, without much oversight. At one point, David stopped remove his firm's association with DOL applications, in an effort to avoid suspicion about the number of applications coming from his firm. Tr. 1310. David ran a large office for many years. He personally trained most of the employees who helped him execute the fraud. And although his employees were criminals themselves, and no doubt failed to disgorge profits to him at times, there is no question that he was in charge for many years – with his name on the door from 1996 to 2004, running things from behind the scenes (because he had been disbarred) until 2006, and actively participating from afar once he fled to Canada.

### IV. The Need to Promote Respect for the Law, to Ensure Just Punishment, and for Deterrence in This Case

There is a critical need in this case to promote respect for the law and ensure just punishment. Lying and scheming have been central to David's life and legal career for over 20 years. As described below, he has misled numerous government entities, minimizing or completely denying his role in fraudulent activities.

<u>Participation in a Securities Fraud</u>

As set forth in a U.S. Securities and Exchange Commission ("SEC") Order Making Findings and Imposing Remedial Sanctions as to Earl David, dated August 18, 2000 (attached as Exhibit C), from in or around 1991 to in or around 1993, David and three co-conspirators participated in stock manipulation and bribery scheme. In connection with an SEC settlement, David disgorged $10,000 he received for his participation in the scheme and paid a $5,000 penalty. David also agreed to cooperate with the government's criminal investigation and was ultimately granted immunity from criminal prosecution.[5] (In the Matter of Earl S. David: Departmental Disciplinary Committee For First Judicial Department, New York Supreme Court, Appellate Division, First Judicial Department, January 29, 2004, Exhibit D, at 1.) As set forth in the Appellate Division's opinion, David was charged with violations of the Code of Professional Responsibility involving fraud and dishonesty.[6] David testified at a hearing on the charges and "substantially admitted the facts on which the charges were based, but set forth mitigating factors in his defense." (Exhibit D at 2.) The Appellate Division emphasized the following mitigating factors (many of which bear a striking resemblance to his claims for leniency in this case): he was a "peripheral figure in the criminal scheme in question," he realized only a "modest benefit," he was "a relatively new attorney and inexperienced in business matters," and "[a]t the time of his wrongdoing, [he] was suffering from depression due to a broken marriage engagement and the serious injury of his father in an automobile accident." (*Id.*) The Appellate Division also noted his cooperation and his "rehabilitation" evidenced by his "practice in the field of

---

[5] The criminal investigation was conducted in the District of Nevada. Because the prosecutor is no longer at the office and the files are not readily available, the Government relies herein on other published opinions referencing the Nevada criminal investigation.

[6] Specifically, he was charged with violating DR1-102(A)(3) (engaging in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer), (4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation) and (7) (engaging in any other conduct that adversely reflects on the lawyer's fitness as a lawyer) and violating DR 9-102(E) (prohibitions against comingling funds).

immigration law" where he "maintained an unblemished disciplinary record." (*Id.*) Of course, as we now know, David was committing a much more significant fraud in the area of immigration law at the very time he claimed to be "rehabilitated."

Practicing Law While Disbarred

Being suspended from the practice of law in New York and New Jersey in 2004 did not stop David from continuing to perpetrate a massive immigration fraud. And, of course, he lied to the New Jersey Disciplinary Committee about what he was doing. Prior to his suspension in New Jersey, David submitted a sworn affidavit of compliance on October 1, 2004, to the Supreme Court of the State of New Jersey Disciplinary Committee (attached as Exhibit E), wherein he falsely stated, among other things, the following:

- Prior to the date of my suspension, I ceased practicing law in any form . . .

- I have no clients to notify as I wound down my practice of law previous to the Order of suspension.

- I am not sharing and will not share in any fee for legal services performed by any other attorney following my suspension . . . .

In March of 2006, David petitioned the Supreme Court of New Jersey Disciplinary Review Board for reinstatement to the Bar of the State. As part of his petition, David submitted a sworn statement (attached as Exhibit F) which included, among other things, the following false statements:

- I reside at 280 Rector Place, Suite 3G, New York, NY 10280.

- During the period of suspension, I have not engaged in the practice of law in any jurisdiction.

- I have complied with the rules and regulations of the Supreme Court of New Jersey concerning suspended attorneys . . .

- In every way possible, I have tried to demonstrate my remorse for the acts which led to my suspension and endeavor to earn the right to regain my status as an attorney in good standing.

The falsity of these statements was made clear at the recent trial, as evidenced in law firm records, bank documents and immigration applications submitted by David and others at the direction of, or in coordination with, David. Indeed, during this exact time period — both before, during, and after his suspension — David was operating and/or facilitating from Canada the operation of a round-the-clock immigration fraud mill, and was being paid in laundered funds for assisting with the submission of fraudulent applications in support of illegal aliens not otherwise entitled to the benefits they sought.

<u>Lies at the Bail Hearing</u>

David lied again in his Canadian bail hearing. He lied about the legal work he was doing in violation of his New York suspension – finally admitting, under cross examination, that he was filling out forms for immigration clients of his old law firm. He also claimed, incredibly (as he continues in his sentencing memorandum (Sent. Ltr. at 13)), that his move to Canada had nothing to do with the Government's investigation of his law firm.

David used his law license and skills of persuasion to commit a massive fraud on the U.S. Immigration authorities and many clients. He recruited dozens of other people, including family members and former clients, in his fraud. And then he repeatedly deceived investigators and triers of facts who attempted to expose his fraud. Accordingly, a significant sentence is warranted for both specific and general deterrence in this case.

## V. David's Attempts to Cooperate In This Case

With regard to his attempts to cooperate, the Government agrees David voluntarily proffered shortly after his extradition, and again just before the recent trial. In his first proffer, he minimized to some extent. Also, in part because David had chosen to flee rather than to cooperate immediately upon learning of the investigation, there was little information he could provide that would be considered substantial assistance, as the conspiracy had essentially been dismantled by the time of his first proffer. David again voluntarily met with the Government shortly before the trial of his co-defendants. During two proffers, he did appear sincere in his desire to help, and voluntarily provided a computer used during the course of the fraud. His statements also appeared truthful, corroborating much of what the Government had been told by cooperating witnesses. He also was available during trial to review an email admitted as a defense exhibit. That being said, David's relatively late-in-the-game efforts at cooperation should not excuse his conduct or significantly impact his sentence

## VI. A Guidelines Sentence Is Consistent With Sentences In Related Cases

A Guidelines sentence would not create any unwarranted sentencing disparities. Most of the defendants who had similar (but less involved) roles than David have received Guidelines or near-Guidelines sentences. All but one law firm employee, as well as several others who participated in the conspiracy, received sentences of incarceration. Abdulbassit Choudary, who worked at the David Firm as a paralegal, and faced Guidelines of 24 to 30 months' imprisonment, was sentenced to 24 months' imprisonment. (PSR ¶ 24.) Mir Hussain, another firm employee, faced Guidelines of 15 to 21 months' imprisonment and was sentenced to one year and one day in prison. (PSR ¶ 27.) David Vago, an accountant who prepared fictitious tax

returns for the firm, faced Guidelines of 15 to 21 months' imprisonment, and was sentenced to one year and one day in prison. (PSR ¶ 22.) John Albert Nolan, a corrupt DOL employee who helped create fake documents to support fraudulent applications, faced Guidelines of 18 to 24 months' imprisonment and was sentenced to 18 months. (PSR ¶ 23.) Janine Sitao, who was a sponsor, but also ran a separate fraud involving hiring undocumented workers, faced Guidelines of 15 to 21 months' imprisonment, and was sentenced to 15 months. (PSR ¶ 26.)

Other sponsors who have been sentenced (facing, at most, Guidelines of 10 to 16 months' incarceration) received probationary sentences due, in part, to their relative roles in the fraud. One other lawyer, Maritza Diaz, who faced Guidelines of 24 to 30 months' imprisonment, was sentenced to three years' probation, in large part due to Probation's recommendation that she not be incarcerated due to personal obligations to a disabled mother and ill son. (PSR ¶ 25.) Another employee, Alexandra Urbanek, also received a probationary sentence after facing a Guidelines range of 24 to 30 months' imprisonment; however, even her plea agreement recognized the extraordinary circumstances present there, and noted that the Government agreed that a below-Guidelines sentence was appropriate due to her personal circumstances. (PSR ¶ 14.) Another accountant, Mohammed Saleem, faced Guidelines of 8 to 14 months' imprisonment, but Probation also recommended he not be incarcerated, and he was sentenced to 3 years' probation. (PSR ¶ 28.)

Of the other cases noted by defense counsel (Sent. Ltr. 21-22) that resulted in below-Guidelines sentences for lawyers, the only case for which the Government was able to determine the Guidelines range applicable at sentencing was defendant Salvador Collazo, who faced Guidelines of 30 to 37 months' imprisonment and was sentenced to 18 months' imprisonment.

Notably, his co-defendant, Dalia Preldakaj, who, like David, actually ran the fraud, faced a Guidelines range of 78 to 97 months' imprisonment, and was sentenced to 78 months' imprisonment. *U.S. v. Collazo and Preldjakaj*, 08 Cr. 1054 (SAS).

## VI. Forfeiture

As referenced earlier, in connection with the defendant's plea, the parties agreed on a proposed Consent Order of Forfeiture in the amount of $2,500,000, a copy of which is enclosed as Exhibit H.

## VI. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines range of 78 to 97 months is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Respectfully Submitted,

PREET BHARARA
United States Attorney

By:_____
Janis M. Echenberg/James J. Pastore, Jr.
Assistant United States Attorneys
(212) 637-2597/2418