# EXHIBIT A

ONTARIO
SUPERIOR COURT OF JUSTICE


B E T W E E N :



THE ATTORNEY GENERAL OF CANADA
ON BEHALF OF
THE UNITED STATES OF AMERICA
Respondent



- and -



EARL SETH DAVID a.k.a. EARL AVRAHAM DAVID
Applicant

*******************************

-- Before the HONOURABLE MADAM JUSTICE FORESTELL, at 361
University Avenue, taken on the 21st day of October, 2011.
*******************************
EVIDENCE OF EARL SETH DAVID
*******************************



A P P E A R A N C E S :

R. KRAMER, Esq.,                    -- for the Attorney Gen.
K.R. BYERS, Esq.,                   -- for the Applicant

- i -

## INDEX OF PROCEEDINGS

WITNESS:                                                    PAGE:

EARL SETH DAVID, Affirmed:
Examination-in-chief (Byers) ....................    1
Cross-examination (Kramer) ......................    5
Re-examination (Byers) ..........................   31

* * * * * * *

1
Earl David
(in-ch.) Byers


<u>OCTOBER 21, 2011</u>


EARL SETH DAVID, Affirmed:


        MR. KRAMER:  Just before I begin with
my cross-examination, I want to ensure
my Friend, if he has any other
questions he wants to ask in-chief that
he have an opportunity to do that, to
be fair.
        THE COURT:  Is there anything that you
wanted to ask?
        MR. BYERS:  Just a few things I think
are relevant to Your Honour's
consideration that arose as a result of
the materials, if I could perhaps just
ask him those questions.


EXAMINATION-IN-CHIEF BY MR. BYERS:
        Q.  Mr. David, in the materials filed
by the Crown they name you as Earl Seth David a.k.a.
Earl Avraham David.  Could you tell the Court, please,
what the Earl Avraham David refers to?
        A.  That refers to, I wrote a book on
Torah codes called Core of the Heart.  That was my

2
Earl David
(in-ch.) Byers


publication name.

Q.   And can you please advise Her
Honour of where you have resided in Canada since 2006?

A.   I resided at 164 Cumberland Street,
Unit 406, Toronto, Ontario, M5R 3V8.

Q.   Is that a house?

A.   That is a condo.

Q.   Who owns that condo?

A.   Libni Milano, my ex-wife.   I
resided there until April, 2008.

Q.   Where did you go in April, 2008?

A.   She sent me away.   I moved to 736
Spadina, Toronto, Ontario, M6A 2K5.

Q.   What is that?

A.   That's a condominium.   I rented a
unit.

Q.   Can you tell me the size of that
unit?

A.   Two rooms.

Q.   Two rooms?

A.   It was considered one bedroom.   I
lived there for like a year, one unit, I believe it
was 909 and then I moved down to 417.   So I lived
there a total of three years.

Q.   What was your rental payment?

3
Earl David
(in-ch.) Byers


A.   Rental payment was 1,500 a month
for the first unit and the second unit, it was 16 and
ended up with 1,650.

Q.   You now live where?

A.   101 Brookview Drive, North York,
Ontario, M6A 2K5.

Q.   Do you have an Ontario driver's
licence?

A.   Yes, I do.

Q.   How long have you had that?

A.   Since I moved to Canada,
approximately '04/'05 I got my licence.

Q.   Does your driver's licence reflect
your address?

A.   Yes, always.

Q.   There was a suggestion in the
materials, sir, that you didn't attend your father's
funeral in the United States.  Where was your father
buried?

A.   Israel, Jerusalem.

Q.   That was his wish to be buried --

A.   Yes.  That was his wish.

Q.   How long was he held in the United
States before he was taken to Israel?

A.   It was the same day, as soon as he

4
Earl David
(in-ch.) Byers


died in the night in the morning he was shipped to

Israel, the body was shipped to Israel.

     Q.  There is an allegation in the

materials, sir, that you travelled to Israel often.

When was the last time you travelled to Israel?

     A.  I was there 1996 with my ex, my

first wife.

     Q.  Tell the Court what, if any, roots

you have in Israel?

     A.  None.  I have the most distant

relatives, the second cousins, I have not seen them in

20 years.  I have no relations with anyone in Israel

right now, none.

     Q.  Do you consider yourself fluent in

Hebrew?

     A.  No.  I could read fluently.  I

could sing but I do not speak fluent Hebrew, no, I do

not.

     Q.  I understand that you purchased a

house?

     A.  Yes.

     Q.  With your new wife?

     A.  Yes.

     Q.  When did you purchase that house?

     A.  We purchased it in -- it closed

5
Earl David
(cr-ex.) Kramer


July, 2011, July 4th, 2011.

Q. There was a down payment made on that house?

A. Yes.

Q. That down payment was how much money?

A. Approximately 107.

Q. What was the value of the house?

A. We bought it for 535. We put some renovations in so perhaps it is worth a little more.

Q. Did you receive any funds in the last two years, extraordinary funds in the way of an inheritance?

A. Yes. I received approximately 125,000 from my grandmother's estate, the estate of F-R-E-M-E-T, L-A-N-G-N-E-R. My lawyer's name is Mr. Eisen. He is an estate lawyer.

THE COURT: How much was that?

THE WITNESS: 125,000.

MR. BYERS: Those are all my questions.


CROSS-EXAMINATION BY MR. KRAMER:

Q. Mr. David, if I ask something that you don't understand or if I have spoken too quickly, please ask me to repeat it. I am happy to repeat my

6
Earl David
(cr-ex.) Kramer


question.  My Friend just asked you if you have

resided in Canada since 2006.  Is that when you

arrived, 2006?

      A.  No.  I said after my suspension, on

April 1st, 2004 my wife bought a condominium in

Toronto because we were coming and going and May, 2004

she bought the condominium where we would be living.

      Q.  When did you move to Canada, sir?

      A.  I was -- it took time to

permanently move but I kept coming back and forth and

the last time I was in the States, my last visit was

November '05 to pick up my last stuff but I started

moving after my suspension.

      Q.  Sir, you have sworn an affidavit

today in support of your bail application.  Is that

right?

      A.  That's correct.

      Q.  Have you read it thoroughly?

      A.  Yes.

      Q.  Do you swear its contents are true?

      A.  Yes.

      Q.  Your Honour, if I may approach Mr.

David and provide him with a copy of that affidavit?

      THE COURT:  Certainly.

7
Earl David
(cr-ex.) Kramer


BY MR. KRAMER:

    Q.  Sir, in case you need to make reference to it?

    A.  Thank you.

    Q.  Mr. David, I understand you were admitted to the New York bar in 1988?

    A.  December 14th, 1988.

    Q.  And the New Jersey bar, what date were you admitted?

    A.  January '89.

    Q.  Also in '88?

    A.  No, '89.

    Q.  Pardon me.  Four years later you participated in a securities fraud, bribery and money laundering scheme.  Is that right?

    A.  Yes.  I can explain.

    Q.  You were investigated for that?

    A.  Yes, I was.

    Q.  And you testified against your co-conspirators in criminal proceedings?

    A.  Correct.

    Q.  You were given immunity?

    A.  Yes.

    Q.  In 2002 you were charged with violating the New York Code of Professional

8
Earl David
(cr-ex.) Kramer


Responsibility.  Is that right?

        A.  Yes, sir.

        Q.  You admitted to all fraudulent
conduct alleged?

        A.  I didn't admit to fraud.  The
suspension was based on writing cheques to cash.

        Q.  Did you admit to the conduct that
was being alleged?

        A.  I admitted to the conduct, yes, but
I was charged with writing cheques to cash.  That was
the ethics violation.

        Q.  You were suspended from the
practice of law for 15 months by the Supreme Court of
New York Appellate Division on January 29th, 2004?

        A.  Yeah, but I got an extension to
March 31st, 2004 and until further order of the court,
15 months plus until order of the court.

        THE COURT:  What was the date again?


BY MR. KRAMER:

        Q.  Am I correct, sir, that your
suspension was ordered on January 29th, 2004?

        A.  I was ordered but I got an
extension, a 30-day extension to wind down business on
March 31st, 2004.

9
Earl David
(cr-ex.) Kramer


Q.   I see.   The decision to suspend you was January 29th but the suspension took effect March --

A.   No.   Actually, it took effect April 1st, 2004.

Q.   That was for 15 months?

A.   And it's very important to say, and through order of the court because after 15 months I couldn't just walk in.   I have to re-apply.

Q.   The court was impressed by your expression of remorse at the time?

A.   Yes.

Q.   And I understand you told the court that at the time of your participation in this scheme you were depressed due to a broken marriage engagement?

A.   Yes.

Q.   And also depressed due to the serious injury of your father in an automobile accident?

A.   Yes.

Q.   You were close to your father?

A.   Very close.

Q.   As I believe you have already described, it's certainly in your affidavit, your

10
Earl David
(cr-ex.) Kramer

father passed away in 2009?

        A.   September 14th, 2009.

        Q.   I am sorry for your loss, sir.

        A.   Thank you.

        Q.   You did not attend his funeral?

        A.   No.

        Q.   Also according to your affidavit,
and I am looking at paragraph 20 of your affidavit,
you have sworn before this court that upon the advice
of your lawyer who defended you in the suspension
proceedings in New York, you left the country and
moved to Canada to start over?

        A.   Yes.

        Q.   That was the legal advice provided
to you, to leave the country?

        A.   That was advice of counsel.  Can I
explain why?

        Q.   No thank you, sir.  Actually, yes,
if you could explain why, please.

        A.   I had many clients and I did give
back a lot of refunds.

        Q.   Sorry?

        A.   I had many clients and I fought
very hard to keep my licence.  I spent 50,000 with a
lawyer to defend me and I did get suspended.  I tried

11
Earl David
(cr-ex.) Kramer

very hard to keep my licence.  I had many clients and

I did give back a lot of refunds.  It was

overwhelming, people were calling me night and day.  I

felt some people were threatening me.  My lawyer said

'The best thing to do is to leave.  You are suspended.

You don't have to stay around'.

       Q.  Your lawyer's advice was to leave

because you were feeling threatened?

       A.  I was overwhelmed with many clients

and I didn't want to be accused of practising law

without a licence.  I left.  I left the country.  I

was always coming to Canada throughout my life and I

felt this was a safe place to remain, to stay.  I am a

Canadian citizen.

       Q.  So you left the country and

notified your clients you were leaving?

       A.  Yes.  Everyone knows.

       Q.  You had many clients who were

contacting you for legal assistance, is that why they

were contacting you at that time?

       A.  Many people were complaining that I

am not working on their case any more so I gave my

practice up and other lawyers took over.

       Q.  You didn't take any steps to

transfer your files to other lawyers?

12
Earl David
(cr-ex.) Kramer


          A.   I did transfer everything but
people were still calling me.  My lawyer even told me
to disconnect your phone but I kept my phone.  My
lawyer told me just walk away.

          Q.   And so you were advised by your
lawyer to literally leave the country?

          A.   Yeah.

          Q.   Sir, you continued to practice law
in the State of New Jersey by Internet from Canada.
Is that correct?

          A.   After I got my licence back.

          Q.   Yes.  And in starting fresh by
moving to Canada you never applied to the Ontario bar,
have you?

          A.   Never, no.

          Q.   You practice exclusively in the
State of New Jersey?

          A.   Correct.

          Q.   You never appear in court in New
Jersey?

          A.   No.  I do have telephonic
conference with the judges all the time, telephonic
conferences I have with the courts.

          Q.   You appear in court by telephone?

          A.   Yes.  Case management conferences

13
Earl David
(cr-ex.) Kramer


are over the phone.

Q.   Do you appear by video conference
as well in courts?

A.   No.

Q.   You hire other counsel to appear
for you?

A.   Yes, I do.

Q.   Do judges with whom you speak on
these teleconferences, are they aware you are
practising law from Toronto?

A.   They know I am out of state.  Yes,
they are aware I am out of state.

Q.   My question was do the judges with
whom you have teleconferences know that you are
practising law from Toronto, Canada?

A.   That I can't answer but I know I do
tell them I am out of state.

Q.   Do you tell them you are in Canada?

A.   If they asked me I would.  No one
has ever asked me.

Q.   Your clients that you have now,
these are not the same clients you had when you were
practising in person in New Jersey?

A.   No.  They are new clients.  They
are foreclosure defence clients.

14
Earl David
(cr-ex.) Kramer

Q.  Are they the same clients that you had when you were practising law in New Jersey?

A.  Different clients since I left.

Q.  These are all new clients?

A.  Yes.  And I tell them all I am living in Canada.  They know that.

Q.  Do you get your new clients by Internet or telephone?

A.  By referral.

Q.  By referral?

A.  Referral, telephone, Internet.

Q.  Your clients retain you without ever meeting you in person?

A.  Yes.  I do use Skype at times when meeting clients.

Q.  Do you practice exclusively in foreclosure defences?

A.  Yes.

Q.  That's the only area of law you have practised since coming to Canada?

A.  Foreclosure defence, practising law foreclusure defence, yes.

Q.  That's the only area?

A.  Yes.

Q.  You do no immigration work?

15
Earl David
(cr-ex.) Kramer


A.  I may have filled out forms, just
biographic information for people but not practising
law.

THE COURT:  I'm sorry, you may have
filled out forms?

THE WITNESS:  Fill out forms.

THE COURT:  You don't need to lean into
the microphone.  I didn't hear your
answer.

THE WITNESS:  I fill out forms.  I
filled out forms in the past, yes,
biographic details only.


BY MR. KRAMER:

Q.  You have filled out forms for
immigration clients?

A.  Yes.

Q.  You don't consider that practising
law?

A.  No.  It's just biographic
information, name, address.  Nothing else.

Q.  These forms that you are filling
in, what type of forms are they, sir?

A.  They are like you get them from
on-line, you download them.

16
Earl David
(cr-ex.) Kramer

Q.   I appreciate that but you are filling out forms with biographic information of your clients.  Is that right?

A.   No.  It's not my clients.  I didn't say my clients.  I fill out forms for someone requesting me to fill out a form.

Q.   Who is requesting you to fill out a form?

A.   Some lawyers asked me.  Some law firm -- the lawyer who used to work for me asked me to fill out some forms.  That's it.

Q.   Lawyers who used to work for you at the David law firm in New Jersey?

A.   No, New York.

Q.   You continue to fill out those forms for those people?

A.   Upon request.

Q.   Upon request and those types of forms are immigration forms?

A.   Yes.

Q.   But you had no intention to do immigration work since 2005?

A.   Correct.

Q.   I am sorry?

A.   Yes.

17
Earl David
(cr-ex.) Kramer

Q.  Sir, I understand your son lives in Florida?

A.  Yes.

Q.  He is currently 16 years old?

A.  Yes.

Q.  You pay him child support?

A.  I finished paying child support.  I made a motion to lower it so with the lawyer in Florida and I paid my ex-wife 30,000.  That was the balance until he was 18 but I advanced it.  I paid $30,000.

Q.  In advance?

A.  Yes.  And she accepted it, she agreed.

Q.  You describe in your affidavit at paragraph 11 that you have a regular relationship with him, I think that's the term you use?

A.  Eleven?

Q.  Yes.


Natalie and I divorced in 1999, but I maintain a regular relationship with my son.

Is that correct?

18
Earl David
(cr-ex.) Kramer

A.   Yes.

Q.   He comes to visit you on occasion?

A.   Yes.

Q.   You have never been to visit him in Florida since you left in 2005?

A.   No.

Q.   He's been coming here all that time?

A.   Yes.

Q.   And in 2005 your son was ten years old?

A.   Yes.

Q.   So he was coming here unescorted?

A.   No.  He was escorted to the airport and I pick him up at the airport.

Q.   When I say unescorted, I mean he was on the plane unescorted?

A.   He came first when he was 12 in 2007 and they allowed him to come like that.

Q.   I beg your pardon?

A.   The airline allowed it.

Q.   To remind you, you don't have to speak into the microphone.

THE COURT:  Your chair keeps squeaking.

19
Earl David
(cr-ex.) Kramer


BY MR. KRAMER:

        Q.   Sir, I understand you know
Alexandra Urbanek?

        A.   Yes.

        Q.   She lives at 424 Kimrod(ph.) Street
in Brooklyn, New York?

        A.   Yes.

        Q.   You have been in contact with Ms.
Urbanek following the search of her business premises
in 2009?

        A.   That was her apartment.

        Q.   You have been in touch with her?

        A.   Yes.  I was in touch.  I know her
for 15 years.  She is a translator.

        Q.   You have been in touch with her
following the search of her residential premises in
2009?

        A.   Yeah.  She called me to say she got
searched.

        Q.   You have exchanged money with Ms.
Urbanek as recently as this month?

        A.   Yes.  I -- she said -- at times she
says she is without money, I wire her money.

        Q.   I am going to ask you to confine
your testimony to what you have said rather than what

20
Earl David
(cr-ex.) Kramer


other people have said because you know as a lawyer

that is hearsay and I don't want to elicit hearsay

from you.

          A.   Okay.

          MR. BYERS:  It sets a background and if

          it is required for background

          information at a bail hearing it is

          certainly admissible.

          MR. KRAMER:  I am not suggesting that

          it is not admissible.  I am trying to

          make sure we proceed in a orderly

          fashion.

          THE COURT:  I don't see any difficulty

          in the explanation as to why he sent

          the money, for that limited purpose.


BY MR. KRAMER:

          Q.  You have sworn in your affidavit

that your main source of income is your New Jersey

legal practice?

          A.  Yes.

          Q.  You have some additional income

derived from your cleaning business?

          A.  Yes.

          Q.  The name of that business is?

21
Earl David
(cr-ex.) Kramer

          A.   Cleo's, C-L-E-O's Cleaning
Services.

          Q.   Is that business incoporated?

          A.   Yes.   It is registered like a
numbered company and is doing business registered in
Toronto.

          Q.   Do you happen to know the name of
the Ontario corporation number?

          A.   Not inside my head but the bank
account is Cleo's Cleaning Services.

          Q.   And at what financial institution
is that bank account in?

          A.   Royal Bank, RBC.

          Q.   That's here in Toronto?

          A.   Yes.

          Q.   Which branch?

          A.   Harbord and Spadina.

          Q.   Besides the cleaning business and
your legal practice you have no other sources of
income?

          A.   No.

          Q.   You maintain separate bank accounts
for your personal life and your businesses?

          A.   Yes.

          Q.   At what financial institution do

22
Earl David
(cr-ex.) Kramer

you have personal bank accounts in Canada?

                A.   Royal Bank.

                Q.   Yes?

                A.   Scotia Bank, TD Bank, HSBC, BMO,
Bank of Montreal.

                Q.   Those are all your personal bank
accounts?

                A.   Personal.

                Q.   And what financial institutions do
you have business accounts?

                A.   At Royal Bank.

                Q.   Any others?

                A.   No.

                Q.   Going back to the banks in your
personal accounts, RBC I think you told us was Harbord
and Spadina?

                A.   Correct.

                Q.   The branch for Scotia Bank?

                A.   I originally opened in Woodbine but
I've been going to one on Bloor and Spadina.

                Q.   Is that where the bank account is
registered?

                A.   No.  I registered at Woodbine.

                Q.   Woodbine and?

                A.   Woodbine and -- by the 401,

23
Earl David
(cr-ex.) Kramer


Woodbine and Steeles.

Q.   Toronto Dominion Bank, which branch
is that?

A.   I think that's also in that area,
Woodbine and Steeles.

Q.   HSBC?

A.   HSBC was Avenue Road and Bloor,
actually Cumberland at the corner.  There is an HSBC
on Cumberland intersecting Avenue Road.

Q.   Avenue Road and Cumberland?

A.   Yes.

Q.   And the BMO bank?

A.   Woodbine and Steeles.

Q.   Sir, you also go by the name of
Earl Avraham David?

A.   Yes.

Q.   Avraham is your Hebrew name?

A.   Yes.

Q.   You wrote a book about Bible codes,
is that right?

A.   Yes.

Q.   That's called Code of the Heart?

A.   Yes.

Q.   It's for sale on Amazon.  Is that
correct?

```
24
```
Earl David
(cr-ex.) Kramer

        A.  Yes.

        Q.  Proceeds from that go to a separate bank account?

        A.  They were going to Mazal Bracha Publishing.  That was my account in the U.S.

        Q.  Could you spell that?

        A.  M-A-Z-A-L  B-R-A-C-H-A.

        Q.  The bank account where proceeds of the sale of that book go is in the name of Mazal and Bracha?

        A.  Yes.

        Q.  Is that a limited company?

        A.  No.  It's a corporation.  I incorporated in New York State.

        Q.  What's the corporation number for that?

        A.  No, it's a name, Mazal.  There is no number.

        Q.  Oh, it's Mazal and --

        A.  Bracha Publishing.

        Q.  Inc.?

        A.  Yes.

        Q.  At what financial institution do you keep that bank account?

        A.  Citibank.

25
Earl David
(cr-ex.) Kramer


Q.   Whereabouts is that?

A.   I opened it I believe it's 111 Wall
Street.

Q.   111 Wall Street, that's in
Manhattan, New York?

A.   New York, New York, correct.

Q.   That's an account that's currently
open?

A.   Yes.

Q.   That's where you have proceeds from
your book, Code of the Heart?

A.   Right.

Q.   Sir, at paragraph 16 of your
affidavit you have sworn:


Since moving to Canada permanently in
2005, I have only left the country
once.  I went to Mexico with Salome to
meter her family.  Other than that, I
have remained in the country for the
last 6 years.


That's accurate?

A.   Yes.

Q.   Salome is your current wife?

26
Earl David
(cr-ex.) Kramer

A. Yes.

Q. You told us it was November, 2005 that you permanently came to Canada?

A. Yes.

Q. You have resided here ever since?

A. Yes.

Q. You have not gone into United States since November, 2005?

A. No.

Q. Sir, have you heard of the U.S. Customs and Border Protection Agency?

A. Yes.

Q. You are aware that the U.S. Customs and Border Protection Agency keeps track of persons entering and leaving the United States?

A. Okay.

Q. Your Honour, if I may approach. Sir, I am showing you a document, the cover page -- I apologize. I only have one copy so we will have to look at it together. The cover page is dated yesterday and it is a certification by a member of the Customs and Border Protection Agency whose name is Keith Jordan --

A. Okay.

Q. Who certifies that the records that

27
Earl David
(cr-ex.) Kramer


he has attached to it are accurate and kept in the

ordinary course of business at that agency.  If I take

you to the first page it details entry into the United

States by you on April 9th, 2006 and November 12th,

2006; November 14th, 2006 at the

Lewiston/Queenston-New York entry?

        A.  I can explain that.  My car was

returned.  Someone took my car back.  I did not go.

The last time was November '05.

        Q.  Your car was taken back on three

separate occasions?

        A.  I did not go in '06.  I know the

date I came.  I last came to the country in November

'05.

        Q.  You have not resided in the United

States since that time?

        A.  That's correct.  Like I said, my

car was taken back.  I had someone take my car back.

I had an incidence once at the border.

        Q.  Who was taking your car back on

those three occasions?

        A.  Mr. Brojerik, B-R-O-J-E-R-I-K,

        Q.  Your car was returned three times?

        A.  Once.  I went November '05, that

was the last time I came back to this country.  I did

28
Earl David
(cr-ex.) Kramer


not come '06.

Q.   Do you have any other explanation
for why the Customs and Border Service --

A.   I don't --

Q.   If I could finish my question?

A.   Yes.

Q.   Do you have any explanation for why
the Customs and Border Service Agency has you entering
the country on those three occasions?

A.   I am not in control of their
records but as far as my memory -- I have a very good
memory.  I last came to this country in November '05.

Q.   You have resided here ever since?

A.   Yes.

Q.   When you applied to have your
licence to practice law reinstated that was in the
State of New Jersey?

A.   I applied, yes.

Q.   That was in 2006?

A.   Yes.

Q.   You filed a sworn statement to the
Supreme Court of New Jersey in support of that
application.  Is that right?

A.   Yes.

Q.   I am going to show you a copy of

29
Earl David
(cr-ex.) Kramer


that sworn statement and I will ask you first if you

can identify that document as the sworn statement that

you signed?

        A.   Okay.

        Q.   Are you familiar with that

document, sir?  Your Honour, I have an extra copy.

Perhaps you can turn to the last page.

        MR. BYERS:  Your Honour, my only

        concern is that if my Friend was

        relying on these materials perhaps they

        should have been provided in his record

        rather than my getting them thrown at

        me in the midst of cross-examination.

        I gave him documents that I got at the

        last minute.  I don't know when he

        received these but I would have thought

        they would have been part of his record

        to support his application -- in

        response to the application.

        MR. KRAMER:  To be clear, Your Honour,

        I am not filing the document as an

        exhibit at this point.  It is just a

        tool that I am using for the purpose of

        cross-examination.

        THE COURT:  All right.

30
Earl David
(cr-ex.) Kramer


BY MR. KRAMER:

Q.  Is that your signature on the last page?

A.  Yes.

Q.  Is this in fact the sworn statement that you filed with the New Jersey Supreme Court in support of your application for reinstatement?

A.  Yes.

Q.  Can you look at the first page of your sworn statement to the Supreme Court of New Jersey.  At paragraph 3, it states:

I am currently 42 years of age, and I reside at 280 Rector Place, Suite 3G, New York, New York.

It gives a telephone number and it says:

Since my suspension, I have lived at the same address.

Is that correct?

A.  Yes.

Q.  And, sir, turning back to the

31
Earl David
(re-ex.) Byers


signature page, your sworn statement is dated March

13th, 2006.  Is that correct?

         A.  Yes.

         Q.  You swore to the New Jersey Supreme

Court on March 13th, 2006 that you reside in New York,

New York.  Am I reading that correctly?

         A.  Yes.

         Q.  I have no further questions.

         THE COURT:  Re-examination?

         MR. BYERS:  Yes.


RE-EXAMINATION BY MR. BYERS:

         Q.  On the last point you have given

evidence that you came to Canada in November, 2005 and

your affidavit suggests that you advised the court

that you were living in New York in 2006.  Can you

explain that?

         A.  That was my -- that was until my

wife sold it we were using that address.  We were

getting mail and I was using that address in New York.

I didn't actually -- I was living in Toronto at the

time but that was a place --

         Q.  It was an address that you owned in

New York?

         A.  Yes, it was a valid address.

32
Earl David
(re-ex.) Byers


Q.   Two other things, I understand I
may have asked this, I understand your father was
comatose for eight years prior to his death?

A.   Yes.

Q.   And can you advise the Court
approximately what kind of dollars and cents you may
have wired to Ms. Urbanek?

A.   Approximately $1,000.

THE COURT:  When, is this on a
particular occasion or in total?

MR. BYERS:  When it was requested.

THE COURT:  I want to understand your
question.  Are you saying on the last
occasion or are you saying --

MR. BYERS:  How many times have you
wired her money?

THE WITNESS:  One time.

THE COURT:  Thank you.


*  *  *  *  *  *

33

THIS IS TO CERTIFY that the
foregoing is a true and accurate
transcript from my shorthand notes
to the best of my skill and ability.

------------------------------------

Hanya Boncza, Official Court Reporter