# EXHIBIT B

CITATION: United States of America v. David, 2011 ONSC 6360
COURT FILE NO.: Ex-209/11
DATE: 20111025

## ONTARIO

## SUPERIOR COURT OF JUSTICE

IN THE MATTER OF an Application Pursuant to s. 18 of the *Extradition Act*, S.C. 1999, c. 18 for the Judicial Interim Release of Earl Seth David, a.k.a. Earl Avraham David

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| **THE ATTORNEY GENERAL OF CANADA on behalf of THE UNITED STATES OF AMERICA** | ) ) ) ) | **Mr. R. Kramer**, counsel for the Attorney General of Canada |
| Respondent | ) ) | |
| - and - | ) ) ) | |
| **EARL SETH DAVID, a.k.a. EARL AVRAHAM DAVID** | ) ) ) | **Mr. K. Byers**, for Mr. David |
| Applicant | ) ) ) ) ) | |
| | ) | **HEARD:** October 21, 2011 |
| | ) | |

**M. Forestell J.**

### RULING ON JUDICIAL INTERIM RELEASE

**Background**

[1]     Earl Seth David was arrested pursuant to a provisional warrant and is sought for extradition by the United States for fraud. It is alleged that Mr. David was the architect of an immigration fraud that was perpetrated from 1996 to 2009. The allegation is that Mr. David

and his co-conspirators filed fraudulent applications to the U.S. Department of Labor on behalf of foreign nationals who paid for the applications.

[2]     Mr. David brings this application for release pending his extradition hearing.

**Evidence**

*Nature of the Evidence*

[3]     A Record of the Case has not yet been filed. The Respondent filed, as part of its record on this application, a letter from the United States Attorney with carriage of the file setting out information and concerns relevant to bail. In addition to the information in the 'bail letter', I received the affidavit of Detective Constable Jeffrey Treusch filed in support of the application for provisional warrant. The affidavit of Detective Constable Treusch attaches as an exhibit the Request for Provisional Arrest setting out the background of the alleged offences.

[4]     The Applicant, Mr. David, filed a record containing his own affidavit and affidavits of the two proposed sureties: his wife, Salome Fernandez Palomo and his uncle, Israel Sheldon Langner.

[5]     Mr. David, his wife and uncle all gave *viva voce* evidence at the hearing.

*The Allegations*

[6]     The Request for Provisional Arrest sets out a two-page summary of the allegations against the Applicant. The summary reads in part as follows:

> Earl Seth David, a.k.a "Earl Avraham David," ("Earl David") operated a New York City law firm known as Earl David and Associates (the "Law Firm") from 1996 through 2009. Under Earl David's direction and during that time period, the Law Firm submitted thousands of fraudulent labor certification applications as well as fraudulent immigration applications to the United States Department of Labor ("USDOL") and the United States Citizenship and Immigration Services ("USCIS")
>
> An investigation into the criminal activities committed by employees and associates of the Law Firm revealed one of the largest immigration fraud schemes in the history of the United States. The subjects of the investigation include attorneys, paralegals, translators, business owners, tax preparers, government officials and accountants. Numerous different schemes have been uncovered during the course of the investigation including, among others, (1) the creation of sham companies to support labor applications submitted to the USDOL, and (2) USCIS and USDOL filings submitted on behalf of aliens with fraudulent tax documents, fraudulent work experience letters and other fictitious documentation.

> Multiple witnesses and aliens (who submitted applications through the law firm) can identify Earl David as the principal operator of the law firm who orchestrated and carried out the fraud scheme. For example, cooperating witnesses will testify that Earl David created fraudulent companies and generated fraudulent documentation to support the fraudulent USCIS and USDOL applications. The witness testimony is corroborated by independent record checks and documents seized pursuant to a number of search warrants and grand jury subpoenas - showing thousands of USCIS and USDOL applications to be fraudulent.
>
> Earl David fled to Canada in 2006 after subpoenas were served on a number of businesses who acted as employer-sponsors for many of the fraudulent USCIS and USDOL applications filed by Earl David and employees of the law firm. Earl David continued to operate the law firm after fleeing to Canada by filing applications electronically and by communicating with co-conspirators by e-mail, telephone and fax. In Earl David's absence, fifteen individuals associated with the law firm have been indicted for violations of U.S. law as a result of their involvement in fraud ongoing (*sic*) the scheme at the law firm. Eleven of these individuals have been convicted of fraud related crimes; two have pending cases; and two are fugitives. Eight search warrants have been executed resulting in the seizure of five hundred and forty-five boxes of evidence and sixteen computers. As a result of this investigation, $80,000 cash was seized and $944,240.51 forfeited.

[7]   The request for provisional arrest asserts that Mr. David left the United States in 2006 following the execution of search warrants, but continued to be involved in the scheme remotely. The request for provisional arrest asserts that Mr. David did not return to the United States after 2006. It also set out the belief of the prosecution that Mr. David has access to large sums of money and the ability to obtain false travel documents.

[8]   The bail letter filed by the respondent in this application repeats much of the request for provisional warrant but also provides additional detail and sets out the concerns of the prosecution with respect to bail. Counsel for Mr. David concedes that the bail letter is admissible,[1] but cautions against undue weight being given to its contents. Mr. Byers, counsel for Mr. David, properly points out that the letter lacks detail where such detail could be favourable to Mr. David. For example, the letter states that "up to $30,000.00" was charged for applications but does not set out the lower end of the price range nor the number of applications at the lower rather than the higher end of the range. The letter suggests that Mr. David may face a sentence of ten years, but does not provide the sentences imposed on the eleven other members of the scheme who have been convicted.

[9]   The bail letter sets out the position and concerns of the prosecution in the United States on the issue of bail. As such, it is an opinion or argument rather than evidence. I have

---

[1] See *United States of America v. Mordi*, [2010] O.J. No. 5204 (S.C.J.)

relied on the affidavit of Detective Constable Treusch and the attached request for the provisional warrant in considering the application. I have not relied on the bail letter in the circumstances.

*Evidence of the Applicant*

[10] Mr. David's affidavit, filed on this application, sets out his personal history and his connection to Canada.

[11] Mr. David has dual citizenship in the United States and Canada. His mother was Canadian and his father American. His mother came to Toronto to give birth to Mr. David but returned immediately with her son to the United States. Mr. David lived in the United States for his entire life up to 2004 or 2005. In his affidavit he swears that he began to move to Toronto in 2004 and made the permanent move in 2005. He states that since moving to Canada permanently in 2005 he has only left the country once to go to Mexico and meet his new wife's family. He says, "Other than that, I have remained in the country for the last six years."

[12] In his *viva voce* evidence Mr. David elaborated on the details of his move to Canada. He testified that he began moving to Toronto in 2004. His wife bought a condominium in Toronto and he was coming back and forth. He moved permanently in 2005. He testified that November 2005 was the last time that he was in the United States.

[13] Mr. David explained that his reason for moving to Toronto was connected to his suspension from the New York and New Jersey bar in 2004. He testified that he began moving in 2004 after he was suspended. Mr. David testified that he was suspended from the bar as a result of his involvement in a fraudulent scheme from 1992 to 1996. He had been granted immunity from prosecution in return for testifying for the prosecution. However, a judge in one of the trials reported his conduct to the New York bar and he was subsequently suspended for 15 months. The suspension from the New York bar resulted in a reciprocal suspension from the New Jersey bar. He was required to apply for the suspension to be lifted after the 15-month period. The New Jersey suspension has been lifted and Mr. David has been practicing foreclosure defence in the State of New Jersey. The New York suspension remains in place.

[14] Under cross-examination Mr. David insisted that he only practiced in New Jersey and only practiced foreclosure defence. However, when specifically asked if he practiced immigration law he responded that "may have filled out forms" with biographic details only. He testified that someone asked him to do this - someone who used to work for him at the Earl David Law Firm.

[15] Mr. David was confronted with a sworn statement that was filed on his behalf in the Supreme Court of New Jersey Disciplinary Review Board. The statement was part of a petition for reinstatement to the New Jersey bar. In the statement, Mr. David had certified as follows: "I currently reside at 280 Rector Place, suite 3G New York, N.Y. 10280. My telephone number is 908-907-0953. Since my suspension, I have lived at the same address." The statement is dated March 13, 2006, signed and certified to be true. In his testimony

before me Mr. David confirmed that he made the statement and certified it to be true. He testified that the address noted in the statement was a mailing address.

[16]   Mr. David was married in 1992 to Nathalie Encaoua and they had a son who is now 16 and lives in Florida with his mother. They divorced in 1999. Mr. David says in his affidavit that he pays child support. When cross-examined on this point Mr. David stated that he paid a lump sum of $30,000.00 towards child support and this amount was accepted. He is **not** currently paying child support. He states that he maintains a regular relationship with his son and that his son comes to Canada to visit on occasion. Under cross-examination he said that his son came to visit him for the first time in 2007 – two years after he left the United States. He did not see his son for two years after he came to Toronto. He never visited his son in Florida.

*Evidence of the Sureties*

[17]   Ms. Paloma, Mr. David's wife, filed an affidavit and gave evidence at the hearing. Ms. Paloma is a landed immigrant who came to Canada approximately eight years ago. She testified that she first met Mr. David in 2008, began living with him around January or February 2010 and married him December 14, 2010. Ms. Paloma is seven months pregnant with a due date in late December.

[18]   Ms. Paloma testified that she and Mr. David travelled to Mexico City in 2008 for Mr. David to meet her parents. Her parents continue to reside in Mexico City. She visited them most recently in August of 2011.

[19]   Ms. Paloma testified that she and Mr. David have started a cleaning business but that it does not generate any income. They rely on Mr. David's legal practice for their income. They purchased a house in July 2011. They have approximately $100,000.00 in equity in the house and Ms. Paloma was willing to sign as a surety for that amount.

[20]   The affidavit filed by Ms. Paloma proposed a release plan that involved Mr. David continuing to carry on his legal practice. In the hearing, that plan was abandoned and it was proposed that Mr. David have no access to computers or to any device that would permit him to access the Internet. It was also proposed that he not be permitted to do any banking and that he be under house arrest. While Ms. Paloma had not previously been responsible for the banking, she assured the Court that she could conduct all banking and could ensure that her husband not have access to any computers.

[21]   The second proposed surety is Mr. David's uncle, Israel Sheldon Langner. Mr. Langner is 82 years old and a Canadian citizen. He operates a transportation brokerage business and has done so for about 10 years. Mr. Langner filed an affidavit stating that he had GICs worth about $240,000 and would be willing to pledge $100,500.00 of this amount to act as a surety for his nephew. This is the only money to which he has access right now. In his affidavit Mr. Langner offered to have regular contact with Mr. David and check in daily if necessary. At the hearing, the plan proposed to the Court was that Mr. Langner would move in with Mr. David and his wife in order to provide supervision of the proposed house arrest.

## Legal Framework

[22]   Judicial interim release pending an extradition hearing is governed by sections 18 and 19 of the *Extradition Act*, S.C. 1999, c. 18. Section 19 of the Act makes Part XVI of the *Criminal Code*, R.S.C., 1985, c. C-46 applicable to judicial interim release pending an extradition hearing. The onus is on the Crown to show cause why Mr. David should be detained pending his extradition hearing. The Crown seeks the detention of Mr. David.

[23]   Section 515(10) of the *Criminal Code* sets out the primary, secondary and tertiary grounds upon which detention may be justified.

> s.515 (10) For the purposes of this section, the detention of an accused in custody is justified only on one or more of the following grounds:
>
> (a)   where the detention is necessary to ensure his or her attendance in court in order to be dealt with according to law;
>
> (b)   where the detention is necessary for the protection or safety of the public, including any victim of or witness to the offence, having regard to all the circumstances including any substantial likelihood that the accused will, if released from custody, commit a criminal offence or interfere with the administration of justice; and
>
> (c)   if the detention is necessary to maintain confidence n the administration of justice, having regard to all of the circumstances, including (i) the apparent strength of the Crown's case, (ii) the gravity of the offence, (iii) the circumstances surrounding the offence including whether a firearm was used, and (iv) the fact that the accused is liable, on conviction, for a potentially lengthy term of imprisonment or, in the case of an offence that involves, or whose subject-matter is a firearm, a minimum punishment of imprisonment of three years or more.

[24]   As observed by Trotter J. in *United States of America v. Ugoh*,[2] because of Canada's international treaty obligations, the risk of absconding must be examined even more carefully in extradition cases than it might be in domestic proceedings.

[25]   In cases involving allegations that a fugitive is part of a large organization, our courts have expressed concern for the potential for flight with false documents and hidden assets.[3] This concern reflects the observation of Chief Justice Lamer in *R. v. Pearson*[4] that most accused do not have the means to abscond, but that those who are part of a sophisticated organization and have access to wealth are more likely to abscond. While Chief Justice

---

[2] [2011] O.J. No. 1383 (S.C.J.) para. 13
[3] See *United States of America v. Gillingham*, [2007] O.J. No. 1270 (S.C.J.), paras. 8-10
[4] [1992] 3 S.C.R. 665 at paras. 61 and 62

Lamer's comments were directed at drug traffickers, they are equally applicable to those accused of being part of a sophisticated fraud.

[26]   The Crown seeks the detention of Mr. David on all three grounds, but particularly on the primary that Mr. David presents a serious flight risk in light of the sophisticated and well-organized scheme in which he is alleged to have been involved and the access to fraudulent documents and on the secondary grounds that he has continued his involvement in the fraudulent scheme through the use of the Internet and electronic documents since coming to Canada.

[27]   Mr. David submits that the proposed plan of full-time supervision by two reliable sureties, house arrest and conditions to prevent access to the Internet or banking, should satisfy concerns on all three grounds.

**Analysis**

*Primary Grounds*

[28]   The seriousness of the charges and the strength of the case for the prosecution in the United States are factors to be considered in assessing the risk of flight. While I am not in a position to assess the ultimate strength of the case against Mr. David, for the purpose of the bail hearing, the case for the prosecution appears to be strong. The prosecution has cooperating witnesses and documentation to support its allegation that Mr. David was actively involved in preparing fraudulent applications. The charges appear to be serious and while I do not rely on the bail letter provided, I can infer that if convicted Mr. David would face a period of incarceration.

[29]   Mr. David's flight to Canada is a significant factor to be considered in assessing the risk of further flight. The respondent links Mr. David's move to Canada to the execution of search warrants in the investigation of the fraudulent scheme. It is the respondent's position that Mr. David fled the United States to avoid prosecution and has avoided ever returning for the same reason.

[30]   Mr David testified that he moved to Canada because he had been suspended from practice and his lawyer for the disciplinary proceedings recommended that he leave the jurisdiction. Mr. David elaborated on this in his testimony, saying that clients continued to call him after his suspension and wanted him to work on their cases. His lawyer told him to disconnect his phone. He decided that he should remove himself from the jurisdiction to avoid contact with clients while suspended and also to start over. Mr. David portrayed his motivation for moving to Toronto as being a desire to comply with the terms of his suspension. He insisted that he began the move shortly after the suspension and made it permanent in 2005.

[31]   I do not find Mr. David's testimony credible with respect to the timing or motivation for his move to Toronto. He verified in a statement to the Supreme Court of New Jersey Disciplinary Review Board in March 2006 that he was residing in New York and had done so since his suspension in 2004. This directly contradicts his testimony before me and his affidavit filed in this Court. I infer that Mr. David, in his evidence before me, was trying to

- 8 -

characterize his move to Toronto as unrelated to the fraud investigation and unrelated to a desire to avoid prosecution. I have no reliable information on precisely when Mr. David moved to Toronto. I accept the evidence of his now wife that she met him in Toronto in 2008 and the evidence of his uncle that Mr. David moved to Toronto four, five or six years ago. I cannot determine the timing of the move except to accept that it was sometime within the last six years. I do not accept that the move was motivated by a desire to avoid contact with former clients or to ensure compliance with his terms of suspension. Mr. David, on his own evidence, has maintained contact with his law firm in New York and has been doing work for that firm since his move and in spite of his suspension. He has removed himself only from the supervision of the United States Courts but not from his former firm.

[32]   Mr. David's connection to this jurisdiction is also a factor to be considered in assessing the risk of flight. Mr. David is a Canadian citizen. However, he has little connection to Canada. He was raised in the United States. He practiced as a lawyer in the United States. His only immediate family member is a brother who lives in the United States. His wife lives in Canada but is not a Canadian citizen and has only been in Canada for 8 years. Ms. Paloma has family in Mexico and a substantial connection to that country. Ms. Paloma does not have family, work or substantial assets in Canada beyond the $100,000.00 equity in the house that she owns with Mr. David.

[33]   I accept that Mr. David has a close relationship with his uncle, Mr. Langner. However, this is a rather tenuous connection to the jurisdiction when one considers that Mr. David lacks any other significant roots in this community.

[34]   The nature of the allegations supports the inference that Mr. David has access to significant funds and that he has the means to access false documents. These factors also increase the risk of flight.

[35]   Having considered these factors I have concluded that there is a considerable risk of flight.

*Secondary Grounds*

[36]   The Crown has also raised concerns on the secondary grounds.

[37]   Mr. David testified that he practiced law in New Jersey but did so from Toronto. He testified that he practiced exclusively foreclosure defence. However, he conceded that he 'filled out forms upon request' when lawyers from the Earl David firm asked him to do so for immigration clients. He stated that he filled in biographic details on forms downloaded from the Internet. It was put to him that he continues to fill out these forms and his response was "upon request".

[38]   Mr. David is not permitted to practice law in New York, but on his evidence continues to have involvement with his former firm and to perform work for them. While I cannot conclude that Mr. David was committing offences when he filled out immigration forms for his former associates in New York, his conduct raises serious concerns about the likelihood that he would obey restrictions imposed by this Court when he appears to have little regard for the terms of his suspension from the New York bar.

[39]    A further concern on the record before me is that Mr. David has previously been involved in a fraudulent scheme. He became involved in the previous scheme in 1992, a mere four years after his call to the bar. That fraudulent scheme involved Mr. David opening a bank account in Canada and writing cheques from the account to cash. The cash was used by a co-conspirator to bribe brokers. He became a witness for the prosecution after being contacted by the prosecution about his role in 1996. The current scheme is said to have run from 1996 to 2009. Therefore, while Mr. David has no criminal record, he has admittedly been involved in a fraudulent scheme for a period of four years in the past. The current allegations cover a time period of 13 years immediately following the end of the other fraudulent scheme. Mr. David's activities in 'filling out forms' at the request of another lawyer have continued, on his evidence, after his move to Canada. His activities in his law practice are conducted from his home through the Internet and over the telephone.

[40]    Counsel for Mr. David properly points out that the fact that Mr. David made a deal for immunity from prosecution does not mean that he was guilty of fraud or would have been convicted if prosecuted. While I accept this argument I can infer from the record before me that Mr. David allowed himself to be used as a means to commit a fraud by establishing a bank account in Canada for use in a fraudulent scheme in the United States. He is now again in Canada, operating a law practice remotely and performing work 'on request' for persons from his law firm in New York. He has done so despite the attempt by the New York State bar to suspend him from practicing.

[41]    In light of the above factors I have concerns on the secondary grounds.

*Tertiary Grounds*

[42]    Detention on the tertiary grounds is justified where the detention is necessary in order to maintain confidence in the administration of justice, having regard to all the circumstances, including the apparent strength of the prosecution's case, the gravity of the nature of the offence, the circumstances surrounding its commission and the potential for a lengthy term of imprisonment.

[43]    As I found in my consideration of the primary grounds, the case for the prosecution is strong, the offence serious and the potential penalty is significant. The circumstances surrounding the commission of the offence point to a sophisticated organization. However, all of these factors have already been considered in relation to the primary grounds. My concern in this case is not with undermining confidence in the justice system by ordering the release of Mr. David, but with the substantial risk of flight and the risk that Mr. David will commit offences if released.

*Adequacy of the Proposed Plan of Release*

[44]    Having concluded that there exist serious concerns on the primary and secondary grounds I must consider whether the proposed plan of release adequately addresses those concerns.

[45]    I cannot conclude that the plan of release is adequate. While the sureties appear well-meaning, the success of the plan rests on the honesty and reliability of Mr. David. Removing

computers from the house will not preclude Mr. David from conducting business by telephone or by mail. Ms. Paloma, from her evidence, has relied entirely on her husband to manage their finances. She was unaware of the transfer of money to one of Mr. David's co-conspirators earlier this year. She did not know what rent they were paying at the apartment before they bought their house. While she may have the intention of fully informing herself about her husband's financial dealings, the success of that endeavour depends on Mr. David. I have no confidence in the honesty of Mr. David in light of his conduct in misleading the court.

[46]     I am of the view that Mr. David is a very significant flight risk in light of his flight to Canada to avoid prosecution, his tenuous connection to this country and the likelihood that he could access false documents and hidden assets. Mr. David has shown himself to be willing to mislead the court and I do not believe that he would feel bound to comply with terms of a release imposed by this Court any more than he has felt bound to tell the truth to the Court. I am not of the view that $200,000.00 pledged by his uncle and wife would cause Mr. David to feel bound to comply or to remain in the jurisdiction. He is alleged to have been part of a multi-million dollar fraud. The amount available for bail is not sufficient to compel the compliance of Mr. David. Nor am I of the view that the presence of his pregnant wife would keep him in the jurisdiction. Mr. David fled the United States and did not see his 10-year old son for two years on his evidence. He has shown himself to be willing to abandon family members to avoid prosecution.

**Conclusions**

[47]     In light of the risk of flight and the risk of further offences if Mr. David were released, I have concluded that Mr. David must be detained pending his extradition hearing. The proposed plan is inadequate to meet the concerns given Mr. David's tenuous connection to Canada and the manner in which he is alleged to have committed the offences remotely through the Internet. I find that Mr. David's assurance that he would abide by terms imposed by the court not to be reliable. He has misled this Court or the court in New Jersey with respect to his residence. He misled this Court as to whether he paid child support. He misled this Court about his relationship with his son characterizing it as 'regular' when he did not see his son for two years. I am of the view that he came to Canada not to make a new start, but to evade prosecution and to continue his law practice without oversight or restriction. Ultimately, even with very good sureties, it is the applicant's ability to comply with terms that is the overriding consideration for the Court. I do not find that Mr. David would be amenable to supervision.

Therefore I find that the Crown has shown cause that Mr. David must be detained pending his extradition hearing. The hearing should be expedited and a hearing date set as soon as possible in light of Mr. David's detention.

M. Forestell J.

**Released:**     October 25, 2011

CITATION: United States of America v. David, 2011 ONSC 6360
COURT FILE NO.: Ex-209/11
DATE: 20111025

## ONTARIO

## SUPERIOR COURT OF JUSTICE

IN THE MATTER OF an Application Pursuant to s. 18 of the *Extradition Act*, S.C. 1999, c. 18 for the Judicial Interim Release of Earl Seth David, a.k.a. Earl Avrahum David

B E T W E E N:

THE ATTORNEY GENERAL OF CANADA
on behalf of
THE UNITED STATES OF AMERICA

Respondent

- and -

EARL SETH DAVID, a.k.a.
EARL AVRAHAM DAVID

Applicant

---

### RULING ON JUDICIAL INTERIM RELEASE

---

M. Forestell J.

Released:   October 25, 2011