1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3
              v.                        11 CR 424 (NRB)
4
    EARL SETH DAVID
5
                   Defendant
6   ------------------------------x

7                                       New York, N.Y.
                                        April 10, 2013
8                                       4:00 p.m.

9
    Before:
10
                     HON. NAOMI REICE BUCHWALD
11                                      District Judge

12
                         APPEARANCES
13
    PREET BHARARA
14       United States Attorney for the
         Southern District of New York
15   JANIS ECHENBERG
     JAMES J. PASTORE, JR.
16       Assistant United States Attorney

17   MOSKOWITZ & BOOK LLP
         Attorneys for Defendant David
18   AVI MOSKOWITZ
     M. TODD PARKER
19

20   -also present-

21   DEIDRE GORDON HSI

22

23

24

25

1              (In open court)

2              THE DEPUTY CLERK:  11 CR 424 United States v. Earl

3     Seth David.

4              Is the government present and ready to proceed?

5              MS. ECHENBERG:  Yes.  Good afternoon, your Honor.

6     Janis Echenberg and James Pastore for the government.  With us

7     at counsel table is Deidre Gordon from Homeland Security

8     Investigations.

9              THE DEPUTY CLERK:  Is defense counsel present and

10    ready to proceed?

11             MR. MOSKOWITZ:  Yes.  Good afternoon, your Honor.  Avi

12    Moskowitz and Todd Parker for Mr. David who is seated in

13    between us.

14             THE COURT:  Let me begin, as I always do, by

15    confirming that I have received all the submissions that I

16    should have.

17             First, I have the sentencing letter of Mr. Moskowitz

18    with 24 exhibits dated March 8.  Then I have another letter

19    enclosing additional letters from family and friends dated

20    March 11.  Then sequentially there is the government's which

21    sentencing memorandum is undated.  Then there is

22    Mr. Moskowitz's response to the government's memorandum dated

23    April 8.  And, finally, I guess where I should have began is

24    the report of the probation office dated March 26.

25             So, my first question to you is whether there are any

1    other documents that I should have received in connection with

2    the sentencing?

3              MR. MOSKOWITZ:  No, your Honor.

4              MS. ECHENBERG:  Nothing from the government, your

5    Honor.

6              THE COURT:  Let me confirm that both parties have

7    received a copy of the report of the probation office.

8              MR. MOSKOWITZ:  We have, your Honor.  I've reviewed it

9    with Mr. David.

10             THE COURT:  Do you have any objections to it?

11             MR. MOSKOWITZ:  Your Honor, the final report contains

12   all of the objections that I made to the initial report and

13   various footnotes.  Other than what's in the report currently

14   in those footnotes, I have no objection.

15             THE COURT:  OK.

16             MS. ECHENBERG:  The government has received it and

17   reviewed it, and we have no objection.

18             THE COURT:  I think, Mr. Moskowitz, the floor is

19   yours.

20             MR. MOSKOWITZ:  Thank you, your Honor.

21             I begin, your Honor, by noting that what I think is

22   pretty obvious; that this is a difficult case.  It's difficult

23   because Mr. David has committed and pled guilty to very serious

24   crimes.  It is also difficult, however, because, as I think we

25   indicated in our sentencing memo, there is substantial

1    mitigating circumstances in this case.

2           I think from the beginning, your Honor, the government

3    has somewhat successfully, portrayed Mr. David as an evil,

4    diabolical criminal who maliciously defrauded both the

5    government and his clients for more than a decade.

6           Now, Earl has admitted and accepts full responsibility

7    for his crimes, but the mitigation that we have pointed out in

8    our submission explains somewhat how he got into that

9    situation.  Significantly, Judge, I think from my conversations

10   with the government, that there is really no dispute that

11   Mr. David suffers from significant mental illness.  We

12   submitted two detailed reports of very established, recognized

13   mental health experts that detail exactly the nature of Earl's

14   mental illness.  He suffers both from significant bipolar

15   disorder which went undiagnosed until his arrest in this case,

16   and is still untreated, and a chronic and complex posttraumatic

17   stress disorder which goes back to probably his teenage years,

18   if not earlier.

19          Now, I point this out, Judge, and I say that I want it

20   very clear, it is not our position that Earl's mental illness

21   excuses his behavior.  The criminal conduct here was

22   inexcusable and that's why he pled guilty, and that's why he's

23   accepted responsibility, but it does go a long way towards

24   explaining what happened and how it happened over such a long

25   period of time.

1      Your Honor, I'm sure this is not the first time your

2  Honor has dealt with someone who suffers from bipolar disorder,

3  but my understanding, based on my experience in the business,

4  so to speak, when someone has bipolar disorder and has manic

5  episodes, they are very productive, but in a crazy way.  They

6  view themselves as vulnerable and as super human.  Their

7  reality testing and reality understanding is way off, and they

8  do things -- and they have extremely poor judgment.  That is

9  classic and characteristic of people with bipolar disorder.

10  And that behavior, the behaviors that the government pointed

11  out that your Honor heard about at trial, are typical of people

12  that suffer from bipolar disorder.  Again, it's not an excuse,

13  but it is an explanation.

14      If your Honor looked carefully at the report of

15  Dr. Drob, he specifically talks about the types of things that

16  would cause someone suffering from this illness to do what Earl

17  did.  He wrote that "Earl has a serious impairment in reality

18  testing, which causes him to fail to anticipate the

19  consequences of his behavior and to exhibit poor

20  decision-making and judgment."

21      He then wrote, "As a result of his mental disorder,

22  poor reality testing, impaired judgment and impulsivity,

23  Mr. David is compromised in his capacity to adequately control

24  his behavior and to fully appreciate the wrongfulness of his

25  conduct.  While he understands that his behavior in his

immigration law practice was illegal, he focused his own mind

on what he believed would be the good that he was doing for his

clients.  The defendant's capacity to adequately appreciate the

wrongfulness of his behavior was fueled by his seriously

impaired reality testing and his consequent failure to separate

fantasy from reality."

        And he concluded that "As a result of his mental

disorders, he suffered from a diminished capacity to exercise

adequate judgment, to fully appreciate the wrongfulness of his

conduct, and to control behavior that he ultimately understood

to be unethical and illegal."

        Again, I stress, we are not minimizing the conduct.

We are not excusing the conduct, but there can be little doubt

that his mental illness contributed significantly to the

behavior.

        Now, I focused till now on the bipolar disorder, but

as discussed at length in the psychological reports, there's

another component to Earl's mental illness, and that is the

PTSD, the posttraumatic stress disorder.  And that, while it

doesn't relate directly to the criminal conduct, it kind of

gives you an understanding of what kind of life Mr. David has

lived till now.  What Dr. Gordon's report shows, and it was a

lengthy social history that was done based on interviews both

of Mr. David and family members and friends that have known him

for a long period of time, is that he has had a particularly

1    difficult life marked with significant tragedies and traumas.

2          Your Honor read, I'm sure, about what's probably the

3    defining trauma in Mr. David's life, which is the accident

4    which took his mother's life when he was 14.  In that accident,

5    Earl was in the car, his mother was thrown from the window, was

6    essentially cut in half, and her blood splattered all over

7    Earl.  Now, today, today we would understand that a child who

8    goes through that needs counseling and needs help and needs

9    something to help him recover.

10         Unfortunately, Earl's father -- and I don't know why;

11   maybe it was the times, maybe it was the European background, I

12   don't know why -- but Earl never got a moment's worth of

13   counseling.  And I think that Dr. Gordon's report indicates

14   he's never really recovered from that trauma.  The way that has

15   manifested itself is while he's recovered enough to function in

16   society, clearly, he graduated college and law school, he had a

17   law practice, you can see the effects of some of those traumas

18   in his personal life.

19         Earl has had two failed marriages.  His first wife who

20   worked in the law practice for a period of time took all his

21   money and took his son -- Carey, by the way, is here, flew up

22   from Florida; it's important to his father -- and took him and

23   took him to Florida.  That was a very difficult event in

24   Mr. David's life.  He initially had sought custody of his son,

25   but having gone through the loss of his own mother, decided to

1    give up Carey and let him be with his mother.  But Earl's

2    managed to maintain a relationship with him.  Carey wrote to

3    the Court and has shown his support by coming up here today.

4           Earl's second wife, as your Honor probably knows from

5    reading the report, was herself severely mentally ill, and,

6    remarkably, Earl was the healthy one in that relationship, or

7    the healthier one in that relationship.  She had a psychotic

8    break.  She, among other things, was found naked in the park

9    one day and shortly thereafter jumped out the third floor

10   window of their apartment.  Earl, to his credit, didn't abandon

11   her.  He took care of her until he couldn't any more.  And they

12   ultimately got divorced.

13          Now, Earl has managed to re-marry, and his wife

14   Salome, also known as Hia, is here with their son who is a

15   little over a year old.  As your Honor knows, he was born after

16   Mr. David's arrest in Canada on this case a little over a

17   year -- about a year and a half ago.

18          I think it's interesting to note that despite the

19   tragedies that Earl has suffered, particularly in his childhood

20   or maybe because of it, he's worked hard to maintain a

21   relationship and develop a relationship with his children, and

22   Carey's coming up here today all the way from Florida is

23   indicative that even though they were separated by distance,

24   Earl has managed to maintain a relationship, and one of which

25   was strong enough that Carey on his own chose to come up here.

1        It's also, your Honor, the experience of having lost a

2   parent as a child that makes this whole situation so painful

3   for Earl because he is now out of his son's life, the baby son.

4   His son is living in Canada with his mother.  There is no

5   money.  And as a result, she comes down here once every four

6   months, every five months.  I think he's seen his son in the

7   five and a half -- in the 18 months or so that he's been

8   incarcerated, maybe three or four times.  So it's very

9   difficult and painful for him, this separation.

10        It's significant, Judge, that while many people have

11   gone through what Earl has gone through, might have become

12   bitter and taken it out on other people, Earl has gone in the

13   other direction and has spent his private time trying to do

14   good and trying to help people.  And that is evidenced by the

15   letters that your Honor received from friends and family, and

16   particularly from numerous community members, particularly

17   senior citizens who Earl helped by driving them to synagogue,

18   driving them to shopping, picking up their groceries, and doing

19   other acts of kindness.

20        Your Honor, many defendants who come into this court

21   have done good things, contributed to charity, and all of that

22   is laudable.  What makes Earl different than some of them is

23   Earl is not talking about giving his money.  He's talking about

24   giving his time and giving up his of his humanity to try and

25   help other people.  That doesn't excuse anything that he did,

1    but, again, it is something that weighs in his favor when the

2    Court considers whether he is really the monster that the

3    government is trying to paint him as.

4           I just want to touch briefly, Judge, on some of the

5    other 3553(a) factors that the Court obviously should consider.

6    The government has contended that a guideline sentence is

7    necessary to deter Earl, and I significantly and seriously

8    dispute that.

9           First of all, I think Earl has exhibited and shown his

10   real remorse.  He waived expedition after his son was born.  He

11   came here.  He proffered shortly after he came, attempting to

12   cooperate.  He pled guilty shortly after he came, and he did

13   that -- his proffers were, I will tell the Court, it's very

14   unusual that right up front the government says, you can

15   proffer, but we don't think we'll ever give him a 5K.  That was

16   the first proffer.  He agreed to do it anyway.

17          When the government called -- in the months prior to

18   trial, when Ms. Echenberg and Mr. Pastore called, it was made

19   very clear that he's not getting a cooperation agreement.  He

20   can come in.  He can answer our questions.  If we think that

21   he's told the truth, we'll let the Court know about that, but

22   he isn't getting a 5K.  He's not getting a cooperation

23   agreement.  And Mr. David agreed to do that.  I think it was

24   really not very fair of the government to downplay that.  It's

25   not every day that a defendant comes in with no promises, in

1    fact, with negative promises, and says, sure, I'll help you

2    out, I'll answer your questions, no promises.  And, in fact, he

3    got, if anything, very little for it.

4           And what's significant, Judge, from my position as a

5    practitioner, is by agreeing to talk to the government,

6    answering their questions in late last year, Mr. David agreed

7    to put off his sentencing which was scheduled for December of

8    last year.  The result of that, Judge, was that rather than

9    sentencing Mr. David on a cold record, your Honor got to hear a

10   trial at which Mr. David was vilified by both sides without an

11   opportunity to defend himself and that could -- I don't think

12   it can help, but taint the Court's view or influence the

13   Court's view, I should say, of Mr. David.

14          I will tell the Court, it was a strong consideration

15   as to whether or not we were going to go ahead with that

16   because there is an advantage to arguing this out without your

17   Honor having heard a one-sided defenseless presentation of what

18   Mr. David is and what he's like and so on.

19          The point of all this, your Honor, is Mr. David has

20   done everything he can to show remorse, to show that he's

21   accepted responsibility, and, yes, he's got a very bad past.

22   He's done a lot of things that were wrong.  Your Honor, the

23   biggest factor that I think you should consider in terms of

24   what kind of sentence Earl needs to be deterred is till this

25   case, till I had him evaluated and reports came in, his mental

1    illness was never diagnosed and never treated.  Now that it has

2    been diagnosed, he can get the treatment that he needs.

3    Clearly, he's going to need medication, which he hasn't gotten,

4    but which now that there's a diagnosis -- and, hopefully, the

5    Bureau of Prisons will give him the appropriate medication --

6    it can go a long way towards controlling the type of manic

7    behavior that got him into this trouble in the first place.

8    That should give the Court some comfort that a long prison

9    sentence is not necessary to deter him.

10           With respect to the question of general deterrence,

11   your Honor, for others similarly situated, whether it's two

12   years or three years or four years, that type of sentence for

13   someone like Earl, others like Earl, is a significant sentence.

14   Giving him six or seven years as the guidelines call for is

15   simply not necessary.  It's more than is required.  Judge

16   Rakoff has pointed that out ad nauseam in terms of the types of

17   sentences imposed in similar type cases.  He's pointed out that

18   for a defendant like this with his background, this type of

19   sentence it is more than necessary; you can do much less and

20   still have the same deterrent effect, and it would deter not

21   only specifically, but generally, people in a similar

22   situation.

23           I point out, Judge, that every day that Mr. David has

24   spent in jail has been very, very difficult for him.  It

25   started in Canada where the commissions, as I understand it,

were not as luxurious, we should say, as the conditions at the

MCC, they're even harsher.  And here at the MCC for a year and

a half, it has been no picnic.  And he's felt this.  He's a man

of slight stature.  He's been threatened.  He's been beaten.

This has not been an easy stretch for Mr. David.

As for what is just punishment and respect for the

law, I submit, as I did in my letter, Judge, that the guideline

sentence or the recommended guidelines range here is not

necessary to achieve either a just punishment or respect for

the law.  I think, in fact, one can make the argument that if

the sentence is too harsh, the opposite would be true.  I think

that a guideline sentence here would not reflect the mitigating

factors appropriately and adequately, and I'd ask the Court to

weigh the mitigation as well as the seriousness of the crime.

Finally, Judge, one last point.  Obviously, Earl is

not alone in this, but it is certainly true and something that

the Court can consider.  When the client's family is outside

the country, the impact of incarceration is that much more

difficult.  Earl's wife is not an American citizen.  She is not

even a Canadian citizen.  She is of Mexican nationality.  She

lives in Canada with their baby.  She can't come and live in

the United States at this point.  She doesn't have a means of

support even if she could come, and, as a result, Earl is

isolated.  His teenage son lives in Florida and comes up every

few months when he can.  His wife comes every few months when

1    she can with the baby, but he's really isolated, and, as a

2    result, every day that he spends is, in many respects, that

3    much more difficult than that served by the average inmate.

4    And I think that is something the Court can consider in

5    fashioning a sentence.

6         So, your Honor, I ask the Court to recognize not only

7    the crimes that Earl has committed, but the fact that he has

8    accepted responsibility, he's shown remorse, and there are

9    substantial mitigating factors, particularly his mental

10   illness, and I ask the Court to weigh all of those factors and

11   impose a sentence below the recommended guidelines range to

12   reflect not only his crime but also the mitigation.

13        Thank you.

14        THE COURT:  Mr. David, would you like to say anything?

15        THE DEFENDANT:  Yes, I would, your Honor.  I'm very

16   nervous, so just bear with me.

17        THE COURT:  That's fine, if you'd like to stay seated,

18   that's fine also.

19        THE DEFENDANT:  OK.  Thank you, your Honor.

20        Your Honor, the Assistant U.S. Attorneys, the special

21   agents, my lawyer, my son, my wife, my baby, my son are here

22   for my support.  I would like to state for the record that what

23   I say today comes from my heart and my soul.  I always speak

24   the truth, so help me God.  I am truly remorseful, contrite,

25   repentful for my criminal activity that landed me in jail for

D4aQdavS                    Sentence

1   the past 547 days and nights, which are very long, dark and

2   mentally painful.  This has given me much time to reflect and

3   introspect.

4           I'm ashamed, embarrassed and humiliated for breaking

5   the law.  I know what I -- I recognize what I did was wrong.  I

6   take full responsibility for my actions, and I can only blame

7   myself for my downfall and destruction.  I regret my past what

8   I did.  I truly regret my past actions.  If I could change the

9   past, I would.  Unfortunately, I cannot.  I stand before this

10  Court as a disbarred attorney and as a broken and humble human

11  being.  I made the wrong choices and decisions, and I'm paying

12  severely for the consequences of my former actions by staying

13  in jail far away from my family.

14          But let me make this clear to the Court, I broke the

15  law, and I deserve to be punished.  I've learned my lesson.  I

16  got the message.  I will never repeat that mistake again of

17  breaking the law.  I am deterred for the rest of my life from

18  committing any crime.  Since my arrest and my incarceration, I

19  have learned to respect and obey the law.

20          I keep in touch with my wife and infant son, and Carey

21  by phone, email and letters.

22          During the past 12 months, I was evaluated by mental

23  health professionals, and I learned for the first time I suffer

24  from bipolar disorder which significantly contribute to my poor

25  decision-making.  I also suffer from posttraumatic stress

disorder, which also explains why I have been unable to escape

the recurring and horrible nightmares for the car accident

which killed my mother, Frances David, when I was 14.

Your Honor, I was originally scheduled to be sentenced

on August 15, 2012.  My lawyer adjourned the date with the

Court's permission to December 12, 2012.  Moreover, a period

prior to my sentencing, the U.S. Attorney's Office contacted my

lawyer if I was willing to cooperate in regards to the upcoming

trial of my co-defendants that was to be held in January 2013.

In good faith and without hesitation and without any promise

and any letter of cooperation, I took the responsibility to

voluntarily assist the government.  I spent many hours with the

Assistant U.S. Attorneys, the special agents, my lawyer as we

went over the evidence assisted in trial.  They treated me with

dignity and respect.

Your Honor, I want to make right whatever wrong I have

done in my past.  I will consciously live with the memory of

this crime for the rest of my life.  I won't repeat it ever

again.  I intend to educate the public.  I promise to respect

and obey the law, and not be in danger of committing any crime.

Life is full of situations and events that come our

way that require us to make choices and decisions.  I will

carefully weigh the consequences of my actions, and I'll make

the right choices and decisions.  Your Honor, I will attend

mental health counseling as well.  I know I need mental health.

1    I will get that mental health, your Honor.

2         For the past -- your Honor, for the past 18 months, my

3    family is suffering with pain and anguish over my imprisonment

4    through no fault of their own but because of my stupid actions.

5    I have not been there for holidays or birthday parties and am

6    basically out of their life.  I'm like the living dead cut off

7    from society.  My wife is like a widow, and my children are

8    like orphans.  I only saw my infant son five times since he was

9    born, and now I didn't see him yet, but now the six time.  My

10   wife has informed me he is walking.  I don't know my own son.

11   I can only blame myself.

12        Carey has been kind enough to come up to me several

13   times.  He is here, your Honor.  You asked about him when I

14   first came.  He's been a very strong support for me, your

15   Honor.  I appreciate it.

16        Your Honor, I am concerned and worried that if I'm

17   handed a lengthy sentence, I am going to lose my family, and my

18   wife is struggling.  In jail you do learn what's really

19   important in life, and that is your freedom and your family.  I

20   will never take that for granted again.

21        Please let me reenter society so that I can re-build

22   my life, be a productive member of the community, a loyal

23   husband to my wife, Salome, a mentor and father to my son,

24   Carey, and a loving and caring father to my infant son, Jacob,

25   who I don't even know.

1    I will respect and obey your order as well.  I will

2 not let this Court down.  I don't smoke.  I don't drink.  I

3 don't do drugs, heaven forbid.  I just want the privilege to

4 work hard to support my family.  Please tender just mercy and

5 please mete out my sentence with kindness and leniency, if not

6 for my wife's sake, at least for my children's sake.

7    Thank you and God bless you.

8    THE COURT:  Ms. Echenberg.

9    MS. ECHENBERG:  Yes, your Honor.  Thank you.

10    As your Honor is aware, this case represents one of

11 the largest immigration frauds that was ever committed in the

12 United States.  It spanned 13 years.  It involved 25,000

13 applications, at least, that were fraudulent.  And Mr. David

14 was the mastermind of that fraud.  I don't think the government

15 has tried to portray him as evil or diabolical or as a monster.

16 I think what we have tried to portray in our submission and the

17 way that the facts of this case portray him is as the

18 architect, as the mastermind of this fraud.

19    The scheme was his brain child.  He identified the

20 loophole with labor certifications that could allow people to

21 claim they were hiring people when they really weren't.  He

22 recruited almost all of the people that participated in the

23 fraud.  A lot of them were his former clients and his family

24 members.  He trained all of them in how to commit this fraud,

25 and he also coached the sponsors, the people who claimed to

employ aliens.  He coached them as to what they should say if
immigration came calling.

        At every opportunity, Mr. David avoided detection and
he avoided prosecution.  When he was disbarred, he set up a
separate office in an apartment building, and he got other
lawyers to put their name on the law firm door, but he
continued to run the fraud secretly.

        And then when the agents started investigating the
fraud, he left the country.  He went to Canada, and he
continued to be very actively engaged with the fraud remotely.
He continued to fill out paperwork.  He continued to coach and
advise other people as to how to conduct the fraud, and he
mediated disputes among the employees from abroad.

        And when he was finally arrested, he continued to
deceive.  He lied in a hearing before the Canadian court.  He
lied about why he was in Canada, but ultimately after being
confronted several times, he conceded that, yes, he was
continuing to conduct legal business related to a New York law
firm even though he had lost his New York license.

        As we mentioned in our submission, this was not the
first time that Earl David was engaged in illegal conduct.  In
the 1990s, he was involved in another financial fraud.  He was
caught, and he cooperated and he got immunity for that.  At the
same time that he was cooperating and getting immunity, he was
getting this other fraud, this massive immigration fraud going.

So he was undeterred.  He didn't stop.  He just kept going and

committed an even worse, even more expansive fraud.

He claims that he was merely trying to help his

clients, and that's what drew him to commit this fraud.  And

while that may have been a piece of it, most of these clients

weren't really helped.  A lot of them, at most, got a year of

work authorization when they had paid to get full permanent

residency.

Now, we don't argue that the clients were deceived in

the sense that they were legitimately entitled to those

benefits.  The clients were certainly part of the fraud as

well, but they paid large amounts of money thinking that they

were going to get permanent residency, and part of Mr. David's

fraud was to substitute one client for another and get more and

more money from different clients.  So clients that thought

they were on a path to a permanent residency lost the benefits

that they thought they had paid for, and most of the time they

didn't even know that they were out of status.  So any claim

that he was truly trying to help people is really disingenuous.

Mr. David profited handsomely from this fraud.  He

agreed as part of his plea to forfeit $2.5 million to agree to

a $2.5 million forfeiture order, which represents his proceeds

from the fraud.  We've laid out in our submission the type of

income that he was receiving; but just to give your Honor a

brief summary, prior to 2006, so from 1996 to 2006 when he was

1    in the office running the fraud every day, a very low estimate

2    is that clients were being charged $5,000 each, and there were

3    thousands and thousands of clients, and Mr. David was taking

4    the lion's share of those payments.

5         In 2006 when he went to Canada, at first he was

6    getting ten percent of the profits through another

7    co-defendant, and even he admits that clients were being

8    charged even more in that later time period.

9         We have records showing $98,000 going to him --

10   laundered to him through the "Code of the Heart," his book, in

11   2007 and 2008.  So any claim that he wasn't making money from

12   this fraud really doesn't hold up.

13        With regard to his cooperation, we certainly didn't

14   intend to downplay what he did.  In our submission, we

15   dedicated a paragraph to letting your Honor know that he did

16   meet with us.  He met with the government initially when he

17   first came here, but at that point really the fraud had been

18   uncovered because he had been avoiding detection for so long,

19   that the agents had really figured out the fraud and figured

20   out the participants so there really wasn't substantial

21   assistance that he could provide at that point.

22        It is true that we communicated with Mr. Moskowitz

23   shortly before trial in particular regarding a defendant who

24   ultimately pled shortly before trial, but we did meet with

25   Mr. David, and we don't dispute that he answered our questions

D4aQdavS                    Sentence

honestly, and, in particular, during trial through his lawyer

he did respond very quickly to a question that we asked.  So we

don't downplay that, but we don't think that that warrants a

below guideline sentence given the scope of the fraud and the

conduct here.

        While Mr. David's personal circumstances are tragic,

we don't think that excuses his behavior, and it does not

warrant a below guideline sentence.  The first time that the

government saw the psychological evaluations was when we

received the submission, the same as your Honor, and we are not

in a position to dispute the diagnosis, nor would we dispute

the diagnosis, but we do disagree that bipolar disease is what

led him to commit this crime.

        We agree with the defense that it's quite surprising

that someone who is purportedly so severely mentally ill could

commit this massive, multilayer, very sophisticated crime.  As

Dr. Drob said in his report, there's no question that the

defendant understood that his behavior was both illegal and

wrong.  He knew what he was doing.  In committing this fraud,

he was calculating, he was deceptive, and he remained

undeterred for over a decade.

        Ultimately, we agree with the probation department,

that while the defendant's mental health issues and traumatic

childhood certainly merit consideration by the Court, they do

not warrant a sentence outside of the guidelines range of 78 to

1    97 months.

2           Given the scope of the fraud, given Earl David's role

3    in the fraud, and particularly the fact that he used his legal

4    training to commit this fraud, it's the government's view that

5    a guideline sentence here is appropriate.

6           THE COURT:  Did you want to respond at all?  I'm not

7    requiring it.

8           MR. MOSKOWITZ:  Judge, I understand that.  Two brief

9    points, relatively minor.  First of all, obviously we're not

10   claiming that Mr. David didn't make money.  He made money from

11   the scheme.  I think that's obvious.  What is worth noting,

12   however, is even when he was in Canada, supposedly hiding,

13   according to the government, he was filing tax returns and

14   paying taxes on the money that he was making and reporting

15   where he was on his tax returns.  So it kind of undercuts the

16   argument that he's hiding when he's hiding in plain sight --

17          THE COURT:  I don't think they said he was hiding.  I

18   think they said --

19          MR. MOSKOWITZ:  The government's claim was that he ran

20   away to hide.

21          THE COURT:  Well, that's pretty documented in the

22   trial record.

23          MR. MOSKOWITZ:  Your Honor, I obviously was not able

24   to address the trial record or the witnesses who said so,

25   but --

1          THE COURT:  No, there are documents.  It's not a

2    matter of believing people.

3          MR. MOSKOWITZ:  Your Honor, the point is he -- even

4    when he's making this money, he is reporting it, he's paying

5    taxes on it.  And the issue with the mental health problems

6    here, Judge -- and I tried to make this argument; maybe I

7    didn't make it clear enough -- the fact that he suffers from

8    bipolar disorder doesn't mean he's not intelligent, doesn't

9    mean he's not capable, doesn't mean he can't function to a

10   certain degree in society.  The problem was that the illness

11   severely impacted on his judgment and his ability to control

12   his actions.  And that's the point.

13         THE COURT:  All right.  Nobody -- no psychologist, no

14   psychiatrist, no licensed social worker is going to tell

15   anybody that a manic episode lasts for 13 years.  So there is

16   just a limit as to how far he can go with this.

17         (Pause)

18         THE COURT:  Considerable time has been spent reviewing

19   the lengthy submissions, both from the probation department,

20   from the defense and from the government.

21         To explain the sentence that I will impose, let me

22   start by discussing the seriousness of the crime.  I think it

23   was very clear from the submissions that most of the people, if

24   not all of them, who submitted letters, really were not

25   informed about what Mr. David's criminal activity was here.  I

think it's important because, of course, the seriousness of the

crime is central to any sentence, but it's also important for

people in the courtroom to be more aware of what was involved

here.

We begin with the length of the crime.  Mr. David has

pled to having been involved in this immigration fraud from

1996 to 2009, a period of 13 years.  There is also the question

of the extent of the criminal activity.  As the government

mentioned, the number of applications, most of which were

fraudulent, numbered roughly 25,000.  There was a serious

consequence to this.  The result was a distortion of the

immigration system.  Individuals undeserving received benefits

to which they were not entitled, but inevitably it also

affected the deserving because there are not unlimited

resources, and there is not unlimited staff.

To the extent that the clients of the David Law Firm

and its successors were not active fraudsters themselves,

presumably these were not wealthy people who did not have a

spare $2,000 or $5,000 to lose if they did not get the benefit

they hoped for.

This enterprise, the David Law Firm was also

incredibly complex, and it needed to be to accomplish the

fraud.  It needed many employees, including employees with a

variety of language skills to facilitate a fraud clientele, and

the number of defendants involved in this case is, I believe,

1    23; and if I'm right, 16 of them were employees of the firm.  I

2    find it particularly significant and disturbing that Mr. David

3    did not hesitate to recruit relatives and the vulnerable, and I

4    very much doubt that were it not for his manipulative ways,

5    that these people would have become involved in the crime that

6    they did.  So much for the suggestion that he is simply a kind

7    soul who would never want to hurt anyone.  The truth is he hurt

8    the people that he got involved in his scheme.  The enterprise

9    had multiple sequential locations and needed to have

10   individuals with multiple skills to carry out the fraud.

11         The David lawyers, accountants, people with computer

12   skills, needed an insider at the department of labor, needed

13   phony sponsors, and eventually it was the creation of

14   connection to Canada so that Mr. David could continue to

15   participate after he left the country clearly to avoid

16   potential prosecution.

17         There has been a lot of downplaying of the amount of

18   money involved, but let's do a little math.  $2,000 per client

19   times 25,000 clients is $50 million.  Up to 3,000 per client,

20   you get to $75 million.  This was very lucrative.  Apart from

21   this crime, Mr. David has demonstrated an inability to conform

22   his conduct to the law.  He committed securities fraud back in

23   1991, and he did cooperate.  So he disgorged $10,000 and paid a

24   fine of $5,000.  As a consequence, he was suspended as a lawyer

25   both in New Jersey and New York, and at the time he argued to

1     the disciplinary boards the same kind of mitigating argument

2     that he's making today.

3              But it didn't work as a wakeup call.  He continued to

4     practice law and committed this fraud, and then he sought to be

5     reinstated to the bar of New Jersey, and there's no reason to

6     believe much of what he told them.  And we know that even after

7     he got arrested here, he was found to have been lying to a

8     Canadian judge by that judge.

9              Now, the defense has placed a great deal of emphasis

10    on the report of Simone Gordon and Dr. Drob.  I start by

11    accepting the proposition of the presentation of the defendant

12    as having had a difficult and traumatic childhood, and have no

13    doubt that there are lasting consequences of those experiences

14    which would affect an individual's interpersonal relationships.

15    But the issue for purposes of sentencing is not whether the

16    defendant has entered into bad marriages or made bad marriage

17    choices or has additional emotional needs as a consequence, but

18    whether the residual emotional consequences of the defendant's

19    childhood are responsible for his criminal behavior.

20             Neither Dr. Drob nor Ms. Gordon denied that Mr. David

21    knew the difference between right and wrong, both as an ethical

22    and as a legal matter.  And it's absolutely obvious that the

23    therapists were never provided with the details of the

24    complexity of this scheme which, in my view, drastically

25    undermines their suggestion that his psychological conditions

1  caused him to engage in a decade or more than a decade of

2  crime.

3          Further, there is no suggestion by anyone that having

4  bipolar disorder causes individuals to engage in immigration

5  fraud, let alone, as I mentioned earlier, having manic episodes

6  that last for 13 years.

7          As I noted earlier, the defendant used a somewhat less

8  involved version of this argument to avoid a longer suspension

9  from the bar.  Nevertheless, despite the awareness of the

10 psychological issues, which he used to his advantage, Mr. David

11 chose not to address those issues, but instead to rely on his

12 untreated issues to avoid the guideline sentence here.

13         Quite frankly, both conclusory statements of the

14 retained experts and his counsel are internally inconsistent

15 and to me fundamentally illogical and unpersuasive.

16         So I do not doubt that Mr. David, like many criminals,

17 has found a way to rationalize his long-standing and repeated

18 conduct, but the proffered rationalization here is just blatant

19 nonsense.  Try as he will to justify his crime and the dollars

20 that he made by claiming that he was just bringing families

21 together, this immigration fraud had nothing to do with

22 reuniting families.  It was about getting labor certifications

23 to keep people here, most of whom probably had their families

24 here, and any relationship to bringing family members into this

25 country was a very distant one at best.

1          So, having considered all of these factors, I am going

2     to sentence Mr. David to 60 months in custody.  I'm placing him

3     on supervised release for two years.  I can say now that I will

4     release him from supervised release if he chooses to leave the

5     United States at the conclusion of his sentence, terminate it

6     early.

7          There is a special assessment of $200 imposed.  I will

8     recommend to the Bureau of Prisons that he be placed in a

9     facility where he may receive treatment for his mental health

10    issues.  And I impose the mandatory standard and special

11    conditions set out at pages 29 to 30.

12          Mr. Moskowitz.

13          MR. MOSKOWITZ:  Your Honor, two relatively minor

14    issues.  I understand the Court's recommendation with respect

15    to a facility where he can get mental health treatment.  If it

16    is available in Otisville, I would ask the Court to recommend

17    that as a place where, among other things, his religious needs

18    can be taken care of, your Honor.

19          THE COURT:  I can, if you want, recommend Otisville

20    and leave it at that.

21          MR. MOSKOWITZ:  That would be great.

22          THE COURT:  And you and he can make the appeals to the

23    prison authorities for whatever you want.

24          MR. MOSKOWITZ:  Thank you, your Honor.  And with

25    respect to the credit for time already served, obviously --

D4aQdavS                    Sentence

 1          THE COURT:  He doesn't get credit for the time in

 2     Canada, I believe, under the law.

 3          MR. MOSKOWITZ:  Well, I'd ask if the Court can

 4     recommend that he be given --

 5          THE COURT:  I was going to give him five and a half

 6     years, so he's already -- and I dropped it to five, so he's

 7     already gotten it.

 8          MR. MOSKOWITZ:  Thank you, your Honor.

 9          MS. ECHENBERG:  Your Honor, if your Honor could just

10     state on the record -- I assume you adopt the PSR the

11     guidelines range.

12          THE DEFENDANT:  I think the guidelines calculation is

13     totally correct.  It was pled to, and one might note

14     inconsistent with the argument, that he agreed to points as

15     being an organizer and leader.  So the suggestion that was made

16     by Ms. Gordon which was really amazing that he was -- he did

17     not have the traits to execute this plan.  That's my point from

18     before.  No one really chose to tell her what was really

19     involved here, so she could go and write this.  But it just

20     doesn't conform to the reality.

21          MS. ECHENBERG:  Three other very quick points, your

22     Honor.  I assume your sentence is concurrent on the two counts.

23          THE COURT:  Sure.  And supervised release as well.

24          MS. ECHENBERG:  And we wanted to move to dismiss

25     Counts Two and Four, and also ask that your Honor sign the

D4aQdavS                    Sentence

1    order of forfeiture that we had passed up.

2            THE COURT:  I've just signed the order of forfeiture,

3    and the Counts Two and Four are dismissed.

4            MR. MOSKOWITZ:  Thank you, your Honor.

5            THE COURT:  All right.

6            MS. ECHENBERG:  And although the defendant pled guilty

7    and he has waived his right to appeal a sentence that is out of

8    the guidelines range, if you could advise him.

9            THE COURT:  Sure.  Absolutely.  The defendant is

10   advised that both I think he waived it in his plea agreement

11   that he has the right to appeal the sentence I've imposed

12   within 14 days.

13           MR. MOSKOWITZ:  Thank you, your Honor.

14           MS. ECHENBERG:  Thank you, your Honor.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25